35 P.3d 383 (2001)
109 Wash.App. 334
Francois CHAUVLIER, Appellant,
v.
BOOTH CREEK SKI HOLDINGS, INC., a foreign corporation, d/b/a The Summit at Snoqualmie; and unknown Defendants John Does 1-3, Respondents.
No. 47844-3-I.
Court of Appeals of Washington, Division 1.
December 3, 2001.
*384 Martinus L. Johnson, Jr., Law Office of Martinus L. Johnson Jr., Bellevue, for Appellant.
Ruth Nielsen, Nielsen Law Office Inc., P.S., Seattle, for Respondents.
AGID, C.J.
In this personal injury action, Francois Chauvlier sued Booth Creek Ski Holdings, Inc. after he was injured while skiing at Alpental, a recreational ski area owned by Booth Creek. The trial court granted Booth Creek's motion for summary judgment based on a liability release Chauvlier signed when applying for his season ski pass. Because the release Chauvlier signed was sufficiently clear and conspicuous and does not violate Washington public policy, we affirm the trial court's summary judgment order.

FACTS
Francois Chauvlier went skiing with a friend at Alpental in the spring of 1999. Chauvlier claims that while going down a trail called "Debbie's Gold," he ran into unmarked "bump/jumps" and "half-pipe" walls that had been erected by the ski area for use in an upcoming snowboarding competition called "Surf the Summit." Chauvlier claims he could not have seen the man-made structures from the top of the run and was completely surprised when he hit the structures and "went airborne." He contends Booth Creek was negligent in putting the temporary structures on the run and keeping the run open without warning recreational skiers.
Booth Creek moved for summary judgment arguing it owed no duty to Chauvlier because he signed the liability release printed on his ski pass application. About a month before the accident, Alpental offered, and Chauvlier purchased, a reduced price Spring season ski pass. To take advantage of the bargain price, Chauvlier had to turn in the day pass he had purchased earlier in the day. He was not required to sign a liability release when he paid full price for the day pass, but he did have to sign one in order to get the discounted spring season pass. The release alerted Chauvlier to the risk of colliding with "man-made structures or objects," and contained a "promise not to bring a claim against or sue [Booth Creek]." The agreement released Booth Creek "from any and all liability for personal injury[,] including death, and property damages resulting from [Booth Creek's] [n]egligence or otherwise."
Chauvlier recalls there "was a frenzied feeling amongst many people about getting the reduced price ski pass." He claims the transaction at the ticket booth was extremely short, and that he had "no time or opportunity to read anything during the transaction." In his declaration, he states that the "ticket seller said nothing about waivers or releases." But Booth Creek contends that Chauvlier had "plenty of time to read and review the liability Release" since there was a wait *385 time of 15-20 minutes to purchase a pass. In addition, Booth Creek points out that Chauvlier had purchased season passes containing similar releases in the years prior to the accident.
The trial court granted summary judgment in favor of Booth Creek based on the liability release. Chauvlier argues that the release is unenforceable because (1) the language was not sufficiently clear; (2) it was inconspicuous; and (3) it violates Washington public policy.

ANALYSIS
Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.[1] On a motion for summary judgment, the court views all evidence and draws all reasonable inferences in the light most favorable to the nonmoving party.[2] On appeal, we review the order de novo.[3]
To prevail on his negligence claim, Chauvlier must establish that Booth Creek owed him a duty of care.[4] Whether there is a duty of care is a question of law.[5] The Washington Supreme Court has recognized the right of parties "expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent."[6] These exculpatory agreements are generally enforceable, subject to three exceptions.[7] First, inconspicuous releases are unenforceable.[8] Second, releases cannot limit liability for acts falling "greatly below the standard established by law for protection of others."[9] Third, releases must not violate public policy.[10]

I. WAS THE LANGUAGE OF THE RELEASE SUFFICIENTLY CLEAR?
Chauvlier first argues that the language of the liability release he signed was "ambiguous and ought not be enforced." Exculpatory clauses are strictly construed under Washington law and are enforceable only if their language is sufficiently clear.[11] A court determines the sufficiency of the language as a matter of law.[12] "Courts should use common sense in interpreting purported releases...."[13]
In Scott v. Pacific West Mountain Resort, the Washington Supreme Court considered the validity of an exculpatory clause contained in a ski school application signed by the parents of a child enrolled in the school. The court held that language promising to "hold [the ski school] harmless ... from all claims" was sufficiently clear to "exculpate the ski school from liability for its own negligence."[14]
Here, Chauvlier argues the language of the release was unclear and ambiguous, pointing out that Booth Creek's "risk manager himself did not know whether the document purported to release Booth Creek from liability for its own negligence." But in making his argument, Chauvlier ignores the plain language of the release, which states in part: *386 I hereby promise not to bring a claim against or sue [Booth Creek].... I freely and voluntarily accept all risks of injury, death or property damage and agree for myself and my heirs to RELEASE, HOLD HARMLESS AND INDEMNIFY [Booth Creek and other releasees] from any and all liability for personal injury including death, and property damages resulting from [Booth Creek's] Negligence or otherwise, including but not limited to: personal injury caused by [Booth Creek's] operation of the ski area or the conditions of the premises such as those listed in the warning paragraph above, or from any participation in recreational activities at the ski area....
The "warning paragraph above" states in part:
Be alert to ... inherent risks including but not limited to ... falls resulting from ... man-made or natural terrain modifications and features....
Regardless of whether Booth Creek's risk manager was familiar with the terms of the liability waiver, the plain language of the clause signed by Chauvlier leaves no doubt of its intent to release Booth Creek from liability for all personal injuries resulting from its negligent operation of the ski area. Therefore, under Scott, we must reject Chauvlier's argument that the exculpatory clause is unenforceable for lack of clarity.

II. WAS THE RELEASE INCONSPICUOUS?
Chauvlier contends that he unwittingly signed the liability release, and that the release was inconspicuous and therefore void. We disagree. An exculpatory agreement will not be upheld if "the releasing language is so inconspicuous that reasonable persons could reach different conclusions as to whether the document was unwittingly signed."[15] But a person who signs an agreement without reading it is bound by its terms as long as there was "ample opportunity to examine the contract in as great a detail as he cared, and he failed to do so for his own personal reasons."[16]
In Baker v. City of Seattle, the Washington Supreme Court invalidated a disclaimer inconspicuously placed in the middle of a golf rental agreement.[17] In contrast, this court upheld a liability release in Hewitt v. Miller against a challenge that it was inconspicuous.[18] The release in Hewitt was entitled "SAFETY AFFIRMATION AND RELEASE," and the first sentence of the last paragraph stated: "I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS AFFIRMATION AND RELEASE BY READING IT BEFORE I SIGNED IT."[19] The court concluded the release was "so conspicuous that reasonable men could not reach different conclusions on the question of whether Hewitt unwittingly signed the document."[20]
The release in this case is more like the one upheld in Hewitt than the one voided in Baker. First, unlike the release in Baker, the release here was not hidden within part of a larger agreement. Rather, it is clearly entitled "LIABILITY RELEASE & PROMISE NOT TO SUE. PLEASE READ CAREFULLY!" Second, the words "RELEASE" and "HOLD HARMLESS AND INDEMNIFY" are set off in capital letters throughout the agreement. Third, like the release in Hewitt, the release here contains the following language just above the signature line: "Please Read and Sign: I have read, understood, and accepted the conditions of the Liability Release printed above." Lastly, although Chauvlier claims there "was no time or opportunity to read anything during the transaction," he offers no evidence to *387 counter Booth Creek's contention that no one was rushed to sign the document, and that if Chauvlier had indicated he needed more time to read the document, he would have been given more time. Therefore, we hold that like the release in Hewitt, the release in this case was sufficiently conspicuous.

III. DOES THE RELEASE VIOLATE PUBLIC POLICY?
Chauvlier next argues that the release he signed violates Washington's public policy, and is therefore unenforceable. We disagree. In Wagenblast v. Odessa School District,[21] the Washington Supreme Court held that conditioning participation in public school interscholastic athletics on the students and their parents releasing the school district from all potential future negligence claims violated public policy. In doing so, the court clarified the analysis to be used in determining whether a release violates public policy. The court identified six non-exclusive factors commonly present in releases that violate public policy.
Under Wagenblast, the enforceability of a release depends on whether: (1) the agreement concerns an endeavor of a type thought suitable for public regulation; (2) the party seeking to enforce the release is engaged in performing an important public service, often one of practical necessity; (3) the party provides the service to any member of the public, or to any member falling within established standards; (4) the party seeking to invoke the release has control over the person or property of the party seeking the service; (5) there is a decisive inequality of bargaining power between the parties; and (6) the release is a standardized adhesion contract.[22]
As noted in Justice Talmadge's concurring opinion in Vodopest v. MacGregor,[23] the first four Wagenblast factors address the substance of the exculpatory clause, while the last two factors concern the procedural fairness of the release.[24] "[T]he more of the foregoing six characteristics that appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds."[25] In Wagenblast, the court determined that all six characteristics were present.[26]
Considering the Wagenblast factors, it is clear that the release in this case does not violate Washington public policy.[27] Although some of the substantive Wagenblast factors are present, the exculpatory clause signed by Chauvlier was not procedurally unfair. Chauvlier correctly points out that recreational skiing is "suitable for public regulation," as RCW Chapter 79A delineates responsibilities of both skiers and ski resort operators.[28] In addition, the Booth Creek ski area is open to the general public, and it has significant control over the safety of its customers while they are using the area's lifts and trails. Although Chauvlier had control over which runs he chose to ski down, as well as how prudently he would ski, he was subject to the risk that Booth Creek would be careless in maintaining the runs and *388 trails. Thus, the first, third, and fourth factors listed above are present here.
The Supreme Court has noted that "a survey of cases assessing exculpatory clauses reveals that the common determinative factor for Washington courts has been the services' or activities' importance to the public."[29] Chauvlier points out that the ski area "had 500,000 skier-visits in the 1997 ski season," suggesting the presence of an important public interest. But despite its recreational appeal, skiing is not a "service of great importance to the public," much less a service of "practical necessity."[30] Rather, skiing is a private and nonessential activity.[31] Unlike medical experimentation, which the Supreme Court has deemed a "matter of public importance," skiing cannot be said to be "vital for the benefit of mankind."[32] Thus, the second, and perhaps most important, Wagenblast factor is not present in this case.
The Wagenblast factors governing the procedural aspects of the exculpatory agreement are similarly lacking here. First, Booth Creek did not have the "nearmonopoly power" that the school districts had in Wagenblast.[33] Chauvlier had the option of skiing at a number of comparable ski resorts. Second, the release signed by Chauvlier was not an adhesion contract. Unlike the plaintiffs in Wagenblast who had "no alternative but to sign the standard release forms provided to them or have the student barred from the program," Chauvlier did not have to sign a release in order to buy a one-day ski pass.[34] Although a day pass was more expensive than the Spring Pass he bought, Chauvlier does not contest the fact that he did have the option of skiing at Booth Creek without signing a release. Therefore, the exculpatory clause here cannot be a "take it or leave it" adhesion contract. Because skiing is not a "matter of public importance" and the exculpatory clause in this case was not procedurally defective under Wagenblast, we conclude the release in this case does not violate Washington public policy.[35]
Both Chauvlier and Booth Creek point us to cases from other jurisdictions that have considered whether exculpatory clauses in the recreational skiing context violate public policy. These cases are only marginally useful here because other states have different methods of determining whether exculpatory agreements violate public policy. For example, Chauvlier relies heavily on Dalury v. S-K-I, Ltd.,[36] a Vermont case holding that an exculpatory clause releasing a ski resort from liability for its own negligence violated public policy. But in finding a public policy violation, the Dalury court expressly declined to adopt the six-factor public policy analysis our Supreme Court adopted in Wagenblast.[37] Because Vermont's public policy *389 analysis widely differs from our own, a case like Dalury loses much of its persuasive value.
In upholding the release in this case, we reject Chauvlier's argument that a preinjury waiver cannot be used to abrogate the duty imposed on ski area operators by RCW 79A.45.030(4).[38] Chauvlier correctly notes that this provision has been construed to impose a general duty of care on ski area operators consistent with previously-articulated common-law duties.[39] However, as we noted above, the Legislature has not chosen to legislate on the public policy issue and until it does, Wagenblast controls our analysis. The Wagenblast factors focus not only on the substantive aspects of a release, but also the procedural aspects. Whether the activity is regulated by statute is but one factor for this court to consider. As discussed above, an analysis of all six Wagenblast factors indicates that the release does not violate Washington public policy. Therefore, under the public policy analysis used in this state, Chauvlier's statutory argument fails.
Affirmed.
ELLINGTON and KENNEDY, JJ., concur.
NOTES
[1] CR 56(c); Kruse v. Hemp, 121 Wash.2d 715, 722, 853 P.2d 1373 (1993).
[2] Scott v. Pac. W. Mountain Resort, 119 Wash.2d 484, 487, 834 P.2d 6 (1992).
[3] Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 63-64, 1 P.3d 1167 (2000).
[4] Tincani v. Inland Empire Zoological Soc'y, 124 Wash.2d 121, 128, 875 P.2d 621 (1994).
[5] Id.
[6] Wagenblast v. Odessa Sch. Dist., 110 Wash.2d 845, 848, 758 P.2d 968, 85 A.L.R.4th 331 (1988) (quoting W. Keeton et al., Prosser and Keeton on Torts § 68, at 482 (5th ed.1984)).
[7] Scott, 119 Wash.2d at 492, 834 P.2d 6.
[8] Id.
[9] Id. In this case, Chauvlier does not claim Booth Creek's conduct was grossly negligent. Therefore, we do not consider whether the release is unenforceable on this basis.
[10] Id.
[11] Scott, 119 Wash.2d at 490, 834 P.2d 6.
[12] Id.
[13] Id. at 491, 834 P.2d 6.
[14] Id.
[15] McCorkle v. Hall, 56 Wash.App. 80, 83, 782 P.2d 574 (1989) (citing Baker v. City of Seattle, 79 Wash.2d 198, 200, 484 P.2d 405 (1971)), review denied, 114 Wash.2d 1010 (1990).
[16] Nat'l Bank of Wash. v. Equity Investors, 81 Wash.2d 886, 913, 506 P.2d 20 (1973) (quoting Lake Air, Inc. v. Duffy, 42 Wash.2d 478, 480, 256 P.2d 301 (1953)).
[17] 79 Wash.2d 198, 199-202, 484 P.2d 405 (1971).
[18] 11 Wash.App. 72, 521 P.2d 244, review denied, 84 Wash.2d 1007 (1974).
[19] Id. at 78-79, 521 P.2d 244.
[20] Id. at 78, 521 P.2d 244.
[21] 110 Wash.2d 845, 758 P.2d 968 (1988).
[22] See id. at 852-56, 758 P.2d 968.
[23] 128 Wash.2d 840, 913 P.2d 779 (1996).
[24] See id. at 865-67, 913 P.2d 779 (Talmadge, J. concurring).
[25] Wagenblast, 110 Wash.2d at 852, 758 P.2d 968.
[26] See id. at 856, 758 P.2d 968.
[27] We reject Booth Creek's contention that Scott, supra, controls the outcome here. The Scott court did not address the issue of whether liability releases signed by adults in the recreational skiing context violate public policy, but focused solely on the issue of parental power to sign releases on behalf of their children. We do recognize, however, that in affirming the trial court's dismissal of the parents' claim based on the exculpatory clause, the Scott decision suggests an exculpatory clause signed by an adult in the recreational skiing context would not violate public policy.
[28] See RCW 79A.45. We note that since the Washington State Legislature has chosen to regulate recreational skiing by statute, it is for the Legislature, and not the courts, to declare that liability releases in the recreational skiing context violate public policy.
[29] Vodopest, 128 Wash.2d at 858, 913 P.2d 779, (citing Recent Case, Negligence Exculpatory Clauses School Districts Cannot Contract Out of Negligence Liability in Interscholastic Athletics Wagenblast, 110 Wash.2d 845, 102 Harv. L.Rev. 729 (1989)).
[30] Wagenblast, 110 Wash.2d at 853, 758 P.2d 968.
[31] See Bauer v. Aspen Highlands Skiing Corp., 788 F.Supp. 472, 474 (D.Colo.1992) (recreational skiing "is neither a matter of great public importance nor a matter of practical necessity.").
[32] Vodopest, 128 Wash.2d at 859, 913 P.2d 779.
[33] Wagenblast, 110 Wash.2d at 855, 758 P.2d 968.
[34] Id.
[35] Booth Creek correctly points out that Washington courts "have consistently upheld exculpatory agreements in the setting of adults engaging in high-risk sporting activities." Vodopest, 128 Wash.2d at 848, 913 P.2d 779. However, we emphasize that our holding here is not based on characterizing skiing as a "high-risk sporting activity." We expressly decline to decide that issue here.
[36] 164 Vt. 329, 670 A.2d 795 (1995).
[37] Instead of focusing on whether skiing is an essential public service, as Washington courts have done, the Dalury court placed greater emphasis on the doctrine of premises liability and the duties owed by the ski area to business invitees. See id. at 797-98. On the other hand, in Allan v. Snow Summit, Inc., 51 Cal.App.4th 1358, 59 Cal.Rptr.2d 813 (1996), a California court upheld a liability release signed by a student skier using a public policy analysis almost identical to the one adopted in Wagenblast.
[38] This provision provides: "A person shall be the sole judge of his or her ability to negotiate any trail, run, or uphill track and no action shall be maintained against any operator by reason of the condition of the track, trail, or run unless the condition results from the negligence of the operator." (Emphasis added.)
[39] See Brown v. Stevens Pass Inc., 97 Wash.App. 519, 527, 984 P.2d 448 (1999) (quoting Scott, 119 Wash.2d at 502, 834 P.2d 6 (holding that the statutory provision imposes a duty on ski area operators "`to provide reasonably safe facilities,'... and to avoid enhancing the skier's risks")), review denied, 141 Wash.2d 1004, 10 P.3d 403 (2000).