[No. 61925-0-I.   Division One.   March 30, 2009.]

JOSEPHINE ANNE JOHNSON, *Appellant*, v. UBAR, LLC, *Respondent*.

534

*Thaddeus D. Sikes* and *James R. Walsh* (of *Law Office of James R. Walsh*), for appellant.

*Sean D. Jackson* (of *Patterson Buchanan Fobes Leitch & Kalzer, PS*), for respondent.

¶1 Schindler, C.J. — The membership agreement Josephine Anne Johnson signed with Mieko's Magnolia Fitness contained a provision that waived all risk of loss, damage, or injury and released Mieko's from liability. Johnson sued Mieko's after she fell and injured herself while working with a personal trainer. Based on the

"Waiver and Release" in the membership agreement, the trial court dismissed Johnson's lawsuit on Mieko's motion for summary judgment. Because reasonable persons could disagree about whether the Waiver and Release provision in the membership agreement is conspicuous, we reverse and remand for trial.

## FACTS

¶2 In 2005, Josephine Anne Johnson was 74 years old and lived in the Magnolia neighborhood in Seattle. The year before, Johnson had rotator cuff surgery on her right shoulder. In April 2005, Johnson had heart surgery to put in a stent[1] at a hospital in Ballard. After completing postsurgery rehabilitation at the hospital, Johnson's doctor recommended that she continue to exercise. Johnson started looking for a gym in the Magnolia area, closer to where she lived. Mieko's Magnolia Fitness is located a block away from Johnson's house.

¶3 In September 2005, Johnson and her friend Mary Ellen Seim went to Meiko's sign up for gym memberships. Johnson signed Mieko's two-page "60 Day Contractual Agreement" (membership agreement). Johnson said that the Mieko's employee was in a hurry to sign her up and the employee did not ask Johnson or Seim to read the membership agreement or explain the agreement to them. Johnson also testified that she was also in a hurry and did not ask him to slow down or explain the document to her. Johnson said that she could not remember whether she read the Waiver and Release provision when she signed the membership agreement. Johnson stated, "The only discussions I had with these people at that time was I wanted to pay by the month and, no, you can't do that. That's not our policy. Our policy is to take it out of your checking account." Johnson has macular degeneration resulting in blurry

---

[1] A "stent" is an open tubular structure of stainless steel or plastic that is inserted into an artery or another bodily tube to keep it from becoming blocked by disease.

vision that Johnson said was corrected "[t]o a certain degree" by wearing glasses. Johnson testified that she could not remember whether she was wearing glasses when she signed the membership agreement.

¶4 Johnson went to the gym twice with Seim to use the treadmill and bicycle. For her third visit on October 18, Johnson had made an appointment with a personal trainer to learn how to use the weight machines. Johnson told the personal trainer that "I'd had open heart surgery and I had a stent put in and the stent was only six months old, and I also had rotator cuff operation."

¶5 Johnson had never used the weight machines before. The personal trainer took Johnson to one of the machines and showed her how it worked. However, when Johnson used the machine, it made her shoulder hurt. The trainer then showed Johnson how to use a second exercise machine with a pull down bar and a bench with a seat. The trainer told Johnson to stand up to grab the bar. The trainer put additional weights on the pull down bar and then told Johnson to sit down and at the same time pull the bar down. Johnson said that she

> couldn't see the bench so I thought I was over it. And she obviously wasn't interested if I was over it or not because she was busy talking to somebody else—or looking over at them or saying something to them. But she said sit down, but there was nothing to sit on . . . .

Johnson testified that she missed the bench "[a]ltogether. It was on a bar or something and then there was a saddle seat, and I hit the end of the bar and went right down on the floor." Johnson said that she fell on her back and banged her head on the floor. Johnson was badly bruised and suffered a cracked vertebra.

¶6 Johnson sued Mieko's, alleging that the personal trainer negligently instructed Johnson on how to use the machine. Johnson sought general and special damages for her injuries.

¶7 Mieko's filed a motion for summary judgment, arguing that the membership agreement included a valid waiver

releasing Mieko's from liability for any loss, damage, or injury. In opposition, Johnson argued that the Waiver and Release was so inconspicuous reasonable persons could reach different conclusions about whether Johnson had unwittingly signed it, making the membership agreement void.

¶8 The court granted Mieko's motion for summary judgment and dismissed Johnson's lawsuit. The trial court ruled:

> There's certainly nothing ambiguous about this particular portion with the waiver and release. The language is very clear. . . . I grant you it's not in their normal bold letters or capital letters, but it's a paragraph that's set apart . . . . I don't think any reasonable person could say that this is not conspicuous.

## ANALYSIS

¶9 Johnson contends that the Waiver and Release in the membership agreement is so inconspicuous that reasonable persons could reach different conclusions as to whether Johnson unwittingly signed the membership agreement. Mieko's contends that because the Waiver and Release is clear and conspicuous, Johnson expressly agreed to waive and release Mieko's from liability.

¶10 We review summary judgment de novo and engage in the same inquiry as the trial court. *Heath v. Uraga*, 106 Wn. App. 506, 512, 24 P.3d 413 (2001). Summary judgment is appropriate only if, in view of all the evidence, reasonable persons could reach only one conclusion. *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992). Where different competing inferences may be drawn from the evidence, the issue must be resolved by the trier of fact. *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 739, 904 P.2d 793 (1995).

¶11 The function of a waiver provision is "to deny an injured party the right to recover damages from the

person negligently causing the injury." *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 491, 834 P.2d 6 (1992). The general rule in Washington is that a waiver provision is enforceable unless (1) it violates public policy, (2) the negligent act falls greatly below the legal standard for protection of others, or (3) it is inconspicuous. *Stokes v. Bally's Pacwest, Inc.*, 113 Wn. App. 442, 445, 54 P.3d 161 (2002). Here, the only question is whether the Waiver and Release in the membership agreement is "so inconspicuous that reasonable persons could reach different conclusions as to whether the document was unwittingly signed." *McCorkle v. Hall*, 56 Wn. App. 80, 83, 782 P.2d 574 (1989).

¶12 Several cases have analyzed waiver provisions to determine whether the language was conspicuous. Factors in deciding whether a waiver and release provision is conspicuous include whether the waiver is set apart or hidden within other provisions, whether the heading is clear, whether the waiver is set off in capital letters or in bold type, whether there is a signature line below the waiver provision, what the language says above the signature line, and whether it is clear that the signature is related to the waiver. *See Baker v. City of Seattle*, 79 Wn.2d 198, 202, 484 P.2d 405 (1971); *McCorkle*, 56 Wn. App. at 83; *Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wn. App. 334, 342, 35 P.3d 383 (2001); *Stokes*, 113 Wn. App. at 448.

¶13 Johnson asserts that we should follow the analysis in *Baker*, 79 Wn.2d 198, and *McCorkle*, 56 Wn. App. 80, to conclude that the waiver and release is not conspicuous. In *Baker*, the releasing language was in the middle of a paragraph in exactly the same print as the rest of the rental agreement. *Baker*, 79 Wn.2d at 200. The court held that the disclaimer clause in the rental agreement was void because "the disclaimer was contained in the middle of the agreement and was not conspicuous. To allow the respondent to completely exclude himself from liability by such an inconspicuous disclaimer, would truly be unconscionable." *Baker*, 79 Wn.2d at 202.

¶14 In *McCorkle*, Valley Fitness's "Application for Membership" included a provision entitled "LIABILITY STATEMENT," which provided that members of the club were liable for property damage, used the equipment at their own risk, and would not hold the club liable for any loss, injury, or damage resulting from an act of any employee. *McCorkle*, 56 Wn. App. at 81. On appeal, this court held that "whether the disclaimer language was so conspicuous that he could not have unwittingly signed the application" was a question for the trier of fact and reversed the trial court's summary judgment dismissal. *McCorkle*, 56 Wn. App. at 84.

¶15 By contrast, Meiko's relies on *Chauvlier*, 109 Wn. App. 334, and *Stokes*, 113 Wn. App. 442, to argue that reasonable persons could not reach different conclusions as to whether the waiver and release provision was not so inconspicuous. In *Chauvlier*, the release was clearly entitled in all capital letters, "LIABILITY RELEASE & PROMISE NOT TO SUE. PLEASE READ CAREFULLY," and the words "RELEASE" and "HOLD HARMLESS AND INDEMNIFY" were printed in capital letters. *Chauvlier*, 109 Wn. App. at 342. In addition, the release was not hidden within a larger agreement and the signature line directly below the release stated, " 'I have read, understood, and accepted the conditions of the Liability Release Printed Above.' " *Chauvlier*, 109 Wn. App. at 342.

¶16 In *Stokes*, we noted that the waiver and release provision in Bally's membership agreement had the title "WAIVER AND RELEASE" in bold, capital letters, the provision addressed only Stokes's agreement "to release Bally's from liability for its negligence," and the waiver and release provisions were "conspicuously displayed within the larger document." *Stokes*, 113 Wn. App. at 449. In addition, immediately below Stokes's signature line was a line stating, " '**WAIVER AND RELEASE**: *This contract contains a **WAIVER AND RELEASE** in Paragraph 10 to which you will be bound.*' " *Stokes*, 113 Wn. App. at 448. We held that reasonable persons could only conclude that the

content was "quite clearly a waiver and release of liability for negligence, not financial obligations." *Stokes*, 113 Wn. App. at 449.

¶17 Here, the two-page membership agreement mostly consists of small, page-wide, justified print, with some portions in boxes and in capital letters. Certain provisions are more prominent because they use capital letters and bold font. However, the only provisions that are in capital letters or bold font have to do with the member's financial obligations.[2] At the top of the first page, Johnson filled in personal information concerning her address, telephone number, and age. Below that information, there is a small paragraph describing the "Membership Restrictions." The next paragraph is contained in a box, all in capital letters, with the heading "NONREFUNDABLE AMOUNT." The nonrefundable amount section explains the amount Johnson is obligated to pay as an initiation fee, followed by a signature line.

¶18 Below that box, the "PRICE DETAIL" is set forth in capital letters and larger print with the amount Johnson would have to pay for the nonrefundable initiation fee, monthly dues, a processing fee, sales tax, and a total nonrefundable amount. To the right and below the "PRICE DETAIL" are paragraphs in small print describing Mieko's policies on "Cancellation," "Dues Increase," "The Club's Right to Suspend or Cancel," "Usage," and "Late Charges, Returned Items, and Collection Costs."

¶19 The next bold heading is **"AUTHORIZATION AGREEMENT FOR EFT."**[3] This paragraph states that Johnson authorizes Mieko's to electronically debit her bank account for any sums that become due with a signature line for the "Member's Signature" and the "Account Holder Signature."

---

[2] Mieko's contends that the heading "Waiver and Release" is in bold. From the photocopied version in the record, it does not appear to be. However, even if the heading is in bold, it is in small font and lowercase letters, unlike the headings for financial provisions elsewhere in the membership agreement.

[3] Electronic funds transfer.

¶20  In between the "Price Detail" and the "Authorization Agreement for EFT" is the paragraph in lower case letters with the heading "Waiver and Release." The Waiver and Release paragraph is located three quarters of the way down the first page, right after the Price Detail and before the Authorization Agreement for EFT, and provides:

> Waiver and Release: I am aware that physical exercise is a calculated risk activity and that using The Club's exercise machines, free weights, aerobics, group fitness, tanning, babysitting services, personal training services, nutritional supplements, and any other facilities and related services offered by The Club involves inherent risks and dangers, including loss of or damage to personal property and serious personal injury or death. I am aware of and understand the scope, nature, and extent of the risks involved in the activities contemplated by this Release and Waiver. I voluntarily assume and freely choose to incur any and all such risks of loss, damage, or injury, including death, including, but not limited to, the risk of harms caused in whole or part by the unintentional conduct of The Club.

There is a signature line below the Waiver and Release provision with Johnson's signature. Next to the line for the "Member's Signature" is a line for a "Co-Signer Signature." These signature lines are directly above the heading in bold and capital letters for "**AUTHORIZATION FOR EFT**."

¶21  The second page of the membership agreement begins with "Regulations & Rules" in larger print, followed by the provisions for the "MEMBER'S RIGHT TO CANCEL," which is in capital letters and set off in a box. There is a final signature line at the end of the second page under the heading and paragraph "Binding Arbitration."

¶22  Here, unlike in *Baker*, the Waiver and Release is set apart by blank lines and includes a signature line below it. However, it is in the same small font size as the rest of the agreement and, unlike the financial provisions in the membership agreement, the Waiver and Release does not include any capital letters, boxes, or bold print. In addition, the location of the Waiver and Release, three quarters of the

way down the page, in the middle of financial terms, could create the impression that the paragraph also relates to the financial obligations. The language is also less conspicuous than in *McCorkle*, where the "LIABILITY STATEMENT" had a heading in bold with capital letters. *McCorkle*, 56 Wn. App. at 81. And the line for "Co-Signer" next to the line for "Member's Signature" could suggest that the signature has to do with Johnson's financial responsibility, not a waiver of liability.

¶23 Although the signature line in this membership agreement is below the Waiver and Release provision, it does not include the same bold font or capital letters as the financial provisions or the Waiver and Release in *Chauvlier*. *Chauvlier*, 109 Wn. App. at 342. And unlike in *Stokes*, the Waiver and Release provision is not conspicuously displayed within the larger document, nor is it clear that the content is a Waiver and Release of liability for negligence, rather than the financial obligations. *Stokes*, 113 Wn. App. at 449. In addition, here, all the provisions that are called to the attention of the reader in the membership agreement concern financial terms.[4]

¶24 Based on Mieko's membership agreement, we conclude that reasonable persons could disagree as to whether the waiver provision is conspicuously displayed and reverse and remand for trial.[5]

APPELWICK and LEACH, JJ., concur.

---

[4] Mieko's also appears to argue that Johnson waived liability by signing the guest card that provided, "I release UBAR, L.L.C. from any liability from loss or injury while on the premises. **NO REFUNDS**." However, the guest card is not incorporated by reference into the membership agreement.

[5] Because we conclude that reasonable minds could disagree about whether the waiver provision is conspicuous, we need not reach the issue of whether Johnson expressly or impliedly assumed the risk by signing the membership agreement and using Mieko's facilities.