IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ELIZABETH DAVIS, individually, | ) | No. 71736-7-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, | ) | |
| WASHINGTON STATE PATROL, | ) | |
| | ) | |
| Respondent. | ) | FILED: October 13, 2014 |

SCHINDLER, J. — Former Washington State Trooper Cadet Elizabeth Davis

appeals summary judgment dismissal of her claims against the State of Washington

and the Washington State Patrol alleging violation of the Washington Law Against

Discrimination, chapter 49.60 RCW. We affirm dismissal of the retaliatory discharge

claim and the hostile work environment claim as to comments made by fellow cadets.

We reverse summary judgment dismissal of the claim of discrimination and the hostile

work environment claim as to Corporal Spurling.

FACTS

In July 2007, Elizabeth Davis[1] began working for the Washington State Patrol

(WSP) as a Communication Officer Assistant. In June 2008, the WSP hired Davis as a

Trooper Cadet. To be accepted into the WSP Training Academy for state troopers, a

---

[1] When Davis was a cadet, her last name was "Griffin." Although some of the declarations refer
to her as "Griffin," for purposes of clarity, we use "Davis."

cadet must successfully complete the Pre-Academy Trooper Cadet Program and a field assignment.

The Pre-Academy Trooper Cadet Program included at least 16 hours per month of on-duty training with experienced troopers. Between June 2008 and September 2009, Davis completed 453 total hours of on-duty training. The on-duty training performance evaluations of Davis were overwhelmingly positive, praising her knowledge of state statutes and her communication skills, judgment, and commonsense.

Davis's field assignment was with the Homeland Security Division (HSD). From July 2008 to September 2009, Davis received excellent job performance evaluations. Davis's immediate supervisor at the HSD, Sergeant Trent Cain, described Davis as "going above and beyond" the job duties. In September 2009, Sergeant Cain recommended Davis for acceptance to the WSP Training Academy. In his recommendation, Sergeant Cain described Davis as someone who "makes solid well thought out decisions before stepping forward," and stated that he had "never questioned her judgment."

On October 20, Davis began training at the Academy as part of the 21st Arming Class. The Academy training consists of Arming and Trooper Basic. Corporal Deborah Laur was Davis's assigned counselor, and was responsible for conducting regular performance evaluations.

Between October and December 2009, Corporal Laur's performance evaluations state Davis excelled in her academic work, and she had received "very positive" feedback on Davis's performance in the practical firearms and "motorist assist" exercises.

Davis did so well during the first few months at the Academy that she was 1 of only 7 cadets selected to enter directly into Trooper Basic. On December 21, Davis began Trooper Basic Training as a member of the 97th Class. There were 25 trooper cadets in the 97th Class. Of the 25 cadets, 21 were Caucasian, 2 were Hispanic, and 1 was Asian. Davis was 1 of only 3 women cadets and the only African American member of the class.

Davis continued to receive good performance evaluations from Corporal Laur and excelled academically in Basic Training. As of February 24, 2010, Davis ranked academically second in her class.

The Academy performance evaluations use a rating system of 1 to 7. A score of 4 or above is "acceptable performance for a cadet." Any performance "that is not deemed acceptable at an academy cadet level" receives a score of 1, 2, or 3.

In January, February, and March 2010, Corporal Laur consistently rated Davis with scores of 4 or above in nearly every category. The narrative portion of the performance evaluations describe Davis as doing well in firearms and physical fitness, and commends her performance as a leader during a riot control practical exercise and in a two-car collision investigation exercise.

Scoring sheets and evaluations completed by several different instructors give Davis high marks in most criteria for her performance in the two-vehicle collision practical exercise, one-vehicle collision practical exercise, night pursuit practical exercise, defensive tactics proficiency evaluation, and the one-car mock collision practical exercise. The peer evaluations completed by her fellow cadets in early March 2010 also praise Davis's leadership, confidence, and intelligence.

From January through March, Davis received only three scores of less than 4, all in the "Driving Skill" category. Corporal Laur's notes from January 22, 2010 state:

> CT [(Control Tactics)] instructors noted you initially appeared timid in controlling your fellow classmates. After encouragement you became more aggressive. Continue to work on your command presence. . . . The instructors would like you to work on your confidence behind the wheel.

An evaluation on February 4 indicates Davis failed a driving exercise, and an evaluation on March 16 states, "The drivers have noted that you were one of the weakest cadets during the day pursuit exercise." However, in the March 22 evaluation, Corporal Laur gave Davis scores of 4 or above and noted, "[Davis] passed the re-test for driving! Outstanding job!"

Corporal Laur states that the "first indication" there were concerns about Davis's performance was when Corporal James Prouty sent an e-mail on March 17 concerning a building search exercise. According to Corporal Prouty, Davis was "visibly shaking" during the exercise "and she appeared very nervous." Corporal Laur "counseled [Davis] regarding this exercise."

On March 30, Davis participated in a pass/fail high-risk vehicle stop exercise graded by Corporal Ryan Spurling. Corporal Spurling failed Davis and wrote that it was "one of the poorer performances I have scene [sic]," and that he had "great concerns for [Davis]'s safety and ability to perform under any danger or pressure." Corporal Spurling's evaluation also criticizes Davis for failing to "demonstrate basic officer safety," being "[w]eak and unsure in voice," not using a "command voice to control the scene," not communicating with her partners, and being "[u]nable to demonstrate any understanding of tactics."

Corporal Laur encouraged Davis to talk with Corporal Spurling "to see where she was weak and how she could improve." Davis asked to meet with Corporal Spurling. Corporal Spurling went to Davis's dorm room to meet with her. During the meeting, Davis says Corporal Spurling told her she "needed to be more aggressive" and if "I was his wife or daughter, he would not want me to be a Trooper."[2]

On March 31, Davis took the open skill test for the control tactics exercise. Corporal Spurling was the instructor and evaluator. Corporal Spurling failed Davis, describing her commands as "unsure and weak," and stating that she appeared "indecisive." Corporal Spurling's evaluation for the open skill exercise states that Davis failed because of "[p]oor decision making," "[p]oor verbal skills," "[e]xcessive force use," and she "[c]ould not justify her use of force."

On April 7, Davis took the open skill test again. Corporal Tegard was the instructor and evaluator for the retest, but Corporal Spurling participated as one of two actors in the exercise. Davis failed the retest. That same day, Davis took the high-risk vehicle stop practical exercise again, and passed. Corporal Spurling did not participate in the high-risk stop exercise.

Corporal Spurling and Corporal Laur met with Lieutenant Blaine Gunkel about Davis's performance in the practical exercises. Lieutenant Gunkel concluded that Davis "would likely be fatally wounded if she was allowed to progress as a cadet." Lieutenant Gunkel reported the concerns about Davis to Captain Coral Estes.

According to Captain Estes, Corporal Spurling told her that Davis was "having issues regarding the practical exercises," and said that he was concerned Davis "was

---

[2] Emphasis omitted, internal quotation marks omitted.

going to be injured or killed if she was allowed to continue on to become a WSP Trooper." Captain Estes also said that Corporal Spurling told her he "counseled [Davis] on her performance, including offering her the opportunity to review the videotape of the failed exercise," but Davis "refused this opportunity." Corporal Spurling also told Captain Estes that Davis "did not take criticism well, and would often challenge [his] evaluation of her performance."

Captain Estes said she "took note" of Corporal Spurling's concerns because he is "nationally recognized for training cadets." Captain Estes also found it "alarming" that Davis refused to review the videotape from the open skill practical exercise she failed before the retest, and that "when questioned on her excessive use of force," Davis was "not able to explain her reasoning" to Corporal Spurling. After watching the videotape of the open skill retest, Captain Estes concluded that Davis "lacked command presence" and should be "terminated from the academy." On April 8, 2010, Captain Estes terminated Davis from the WSP Academy.

Davis filed a lawsuit against the State of Washington and the WSP (collectively WSP) alleging race and gender discrimination, hostile work environment, and retaliation in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW.

The WSP filed a motion for summary judgment dismissal of the lawsuit. The WSP asserted the undisputed evidence showed that "a series of field tests raised concerns among the State Patrol Training Academy staff collectively, and the Commander of the Training Division, that Davis would pose a risk to herself, fellow troopers, and the general public if graduated to become a trooper."

6

In support, the WSP submitted a number of declarations, as well as notes from Corporal Laur "regarding [her] interactions with [Davis]." The notes appear to have been prepared after Davis was terminated from the Academy. In the notes, Corporal Laur states that Davis was "very weak during most driving practical exercises" and that during counseling sessions, Corporal Laur "continued to explain" to Davis that she "needed to work on command presence, confidence and taking charge of dynamic situations with appropriate levels of force."

Captain Marc Lamoreaux, the Division Commander for the WSP Human Resources Division in 2009 and 2010, states that "[a]ll cadets receive the same opportunities and must meet the same standards to become a WSP Trooper." According to Captain Lamoreaux, two Caucasian male cadets who failed the open skill practical exercise both received "retraining similar to [Davis]," both passed the retest, and both graduated from the Academy. Captain Lamoreaux states that five cadets "were dismissed or resigned from the 97th Trooper Basic Training Class." In addition to Davis, "three Caucasian males and one Caucasian female" were dismissed or resigned.

The WSP also submitted a "Job Performance Counseling/Documentation Record" prepared by Corporal Don Varkevisser. The document was sent to several cadets, including Davis. It states that "[o]nly one make-up exam will be given; failure to obtain a passing grade on the make-up exam shall result in dismissal from the Academy." The Job Performance Counseling/Documentation Record states, in pertinent part:

> The 97th TBTC [(Trooper Basic Training Class)] Procedures, Rules, and Regulations states under "S-2" that each student shall be required to successfully demonstrate skills and abilities through practical exercises. . . .

Section "S-2a" states that Failure to satisfactorily pass any practical exercise shall require a make-up exam to be given within 10 working days or by the end of the class. Additional instruction may be provided, upon the student's request. Only one make-up exam will be given; failure to obtain a passing grade on the make-up exam shall result in dismissal from the Academy.

In opposition to summary judgment, Davis asserts Corporal Spurling treated her differently from other cadets. In her declaration, Davis states that during the open skill exercise, Corporal Spurling "kept trying to convince the other cadets that what I was saying was not enough and continued to question me," and "did not question other cadets or give any of the other cadets as a hard of time as he did with me." Davis states that during the high-risk stop exercise, Corporal Spurling yelled at her, telling her that she "sound[ed] like a flight attendant."[3] And although Academy staff "usually meets with cadets in their offices," when Davis asked to meet with Corporal Spurling after failing the high-risk stop exercise, he met with her in her dorm room. Davis said she was "offended" Corporal Spurling came to her dorm room to meet with her "because he knew there would be no privacy with all the other cadets around."

According to Davis, she was never told there were "issues with [her] performance until the last week," and she was discharged "without warning of any unresolved problems or issues." Davis identifies male cadets who "were given three attempts to retest after failing various tests (Cadet Sanchez, numerous others)," and a Caucasian female cadet who "continuously failed a driving test and she was not terminated" and her errors were " 'ignored' " by the Academy staff. Davis states a Caucasian male cadet "repeatedly performed poorly on exercises and was counseled and coached and given

---

[3] Emphasis omitted.

chance after chance, but not terminated." According to Davis, "Caucasian male cadets who failed exercises were given the opportunity for retraining," but she "was not given the same opportunities."

Davis submitted performance appraisals and commendations she received at HSD, evaluations of her performance in the Pre-Academy Trooper Cadet Program, the weekly observation reports from Corporal Laur, a list of her exam scores in Arming and Trooper Basic, and scoring sheets evaluating her performance in several different practical exercises.

Davis also submitted the 2009 WSP Training Division Standard Operating Procedures Manual and the roster from the 97th Trooper Basic Training Class. The roster shows that Davis was the only member of the class who had been terminated.[4] The 2009 WSP Training Division Standard Operating Procedures Manual states that failure to pass the open skill practical exam "will result in four hours of retraining followed by a make-up exam," and that if a cadet fails the open skill for control tactics make-up exam, they "may receive another four hours of retraining followed by another make-up exam." The Manual provides, in pertinent part:

S.  ACAMEDIC REQUIREMENTS

. . . .

    2.  Each student shall be required to successfully demonstrate skills and abilities through practical training exercises. Unless otherwise noted, these "practicals" may be graded on a pass/fail criterion; however, when a score is provided, the 75 percent requirement shall apply.

---

[4] The roster indicates four other Caucasian members of the class "resigned." All but one were male.

9

a. Failure to satisfactorily pass any practical exercise shall require a make-up exam to be given within seven working days or by the end of the class. Additional instruction may be provided, upon the student's request.

b. Specifically regarding Emergency/Pursuit Driving Certification, Control Tactics (Closed Skills & Open Skills), or Firearms Qualification: a failure to pass any one of these practical examinations will result in four hours of retraining followed by a make-up exam. If a student fails the make-up exam they may receive another four hours of retraining followed by another make-up exam; discretion of Academy Commander and/or designee. A failure of the second make-up exam shall result in dismissal from the Academy.[5]

In reply, the WSP submitted a declaration from Corporal Spurling. Corporal Spurling states that he met with Davis in her dorm room because he "heard that she had been crying about her performance in the failed exercises," and he "wanted to provide her with information and a counseling session before her next round of tests." According to Corporal Spurling, he met with Davis "with the door open and in public view as part of WSP policy and refused her request to have the meeting behind closed doors."

At the hearing on the motion for summary judgment, the WSP argued that "assuming without conceding" that Davis had presented a prima facie case of race and gender discrimination, Davis did not present any evidence to rebut the legitimate nondiscriminatory reasons for terminating her from the Academy. The court granted the motion for summary judgment dismissal of the lawsuit.

ANALYSIS

Davis appeals summary judgment dismissal of her claims for race and gender discrimination, hostile work environment, and retaliation. We review orders of summary

---

[5] Emphasis added.

judgment dismissal de novo, engaging in the same inquiry as the trial court. Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wn.2d 168, 177, 125 P.3d 119 (2005). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). When making this determination, we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). A material fact precluding summary judgment is a fact that affects the outcome of the litigation. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164-65, 273 P.3d 965 (2012). Where there are competing inferences that may be drawn from the evidence, the issue must be resolved by the trier of fact. Johnson v. Ubar, LLC, 150 Wn. App. 533, 537, 210 P.3d 1021 (2009).

Summary judgment in favor of the employer "is seldom appropriate" in employment discrimination cases because the record will generally contain "reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." Scrivener v. Clark College, No. 89377-2, 2014 WL 4648179, at *3 (Wash. Sept. 18, 2014)[6]; Kuyper v. Dep't of Wildlife, 79 Wn. App. 732, 739, 904 P.2d 793 (1995). "To overcome summary judgment, a plaintiff only needs to show that a reasonable jury could find that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions." Scrivener, 2014 WL 4648179, at *3. "This is a burden of production, not persuasion, and may be proved through direct or circumstantial evidence." Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 149, 94 P.3d 930 (2004).

---

[6] Internal quotation marks omitted.

11

Race and Gender Discrimination Claims

Under the WLAD, it is an unfair practice for an employer to terminate or refuse to hire any person on the basis of race or gender. RCW 49.60.180(1), (2). Where a plaintiff lacks direct evidence of discrimination, Washington courts use the three-part burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[7] Scrivener, 2014 WL 4648179, at *3. The plaintiff has the initial burden of establishing a prima facie case of discrimination. Once the plaintiff presents a prima facie case, a presumption of discrimination exists, and the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its adverse employment action. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988). If the employer meets this burden, the plaintiff must produce sufficient evidence that the alleged nondiscriminatory reason was a pretext. Scrivener, 2014 WL 4648179, at *3.

To establish a prima facie case of discrimination, Davis must show (1) she belongs to a protected class, (2) she was treated less favorably in the terms or conditions of her employment than a similarly situated nonprotected employee, and (3) she and the nonprotected "comparator" were doing substantially similar work. Washington v. Boeing Co., 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).[8] A similarly situated employee or "comparator" is one who has a similar position and engages in the

---

[7] Because the WLAD is patterned after Title 7 of the Civil Rights Act of 1964, 42 U.S.C. 2000e, Washington courts rely on federal decisions interpreting Title 7 to decide issues under the WLAD. See, e.g., Oliver v. Pac. Nw. Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Haubry v. Snow, 106 Wn. App. 666, 674 n.7, 31 P.3d 1186 (2001).

[8] The elements for a prima facie case are not absolute but vary based on the relevant facts. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); McDonnell Douglas, 411 U.S. at 802 n.13; Grimwood, 110 Wn.2d at 363-64.

same misconduct. Johnson v. Dep't of Social & Health Servs., 80 Wn. App. 212, 214 n.1, 907 P.2d 1223 (1996).

"The burden of establishing a prima facie case of disparate treatment is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). "The 'requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence.' " Fulton v. Dep't of Social & Health Servs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012)[9] (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)).

Here, there is no dispute Davis belongs to a protected class and was performing substantially the same work as other nonprotected employees. The WSP contends that Davis cannot show she was treated less favorably than a nonprotected employee was because four Caucasian cadets, including three men and one woman, were also dismissed.[10] Viewing the evidence in the light most favorable to Davis, we conclude Davis has established a prima facie case of discrimination. The class roster shows that Davis was the only cadet who was "terminated." Davis alleges Caucasian male cadets also failed make-up exercises but were given more opportunities to retake exams.

The record establishes the WSP articulated a legitimate nondiscriminatory reason to terminate Davis. The WSP asserts it terminated Davis because of the concerns for officer safety.

---

[9] Alteration in original, emphasis in original.

[10] The WSP also asserts Davis was not similarly situated. But it presents no evidence of how other cadets performed overall in the Academy.

13

The parties dispute whether Davis produced sufficient evidence that the alleged nondiscriminatory reason to terminate her was pretextual.

Davis argues there are material issues of fact as to whether race or gender was a "substantial factor" in the decision to terminate her. The WSP contends the "substantial factor" test is inapplicable on summary judgment and Davis must disprove the legitimate nondiscriminatory reasons to terminate her were motivating factors.

In Scrivener, the Washington State Supreme Court recently considered and rejected the same argument the WSP makes. The court held that "[a]n employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production." Scrivener, 2014 WL 4648179, at *4.[11]

> Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor. See [Mackay v. Acorn Custom Cabinetry, Inc., 127 Wn.2d 302, 309-11, 898 P.2d 284 (1995)]. An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD. See Mackay, 127 Wn.2d at 309-11.

Scrivener, 2014 WL 4648179, at *4.

The court clarified the burden of proof to satisfy the pretext prong:

> An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.

Scrivener, 2014 WL 4648179, at *4 (citing Fell v. Spokane Transit Auth., 128 Wn.2d 618, 643 n.32, 911 P.2d 1319 (1996); Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 73, 821 P.2d 18 (1991); Grimwood, 110 Wn.2d at 365).

---

[11] Emphasis in original.

The court held that the plaintiff may satisfy the pretext prong by showing " 'the defendant's articulated reasons (1) had no basis in fact, (2) were not really motivating factors for its decision, (3) were not temporally connected to the adverse employment action, . . . (4) were not motivating factors in employment decisions for other employees in the same circumstances,' " or by presenting sufficient evidence that although the employer's stated reason is legitimate, "discrimination nevertheless was a substantial factor motivating the employer . . . as we made clear in Wilmot, Fell, and Riehl." Scrivener, 2014 WL 4648179, at *4 (quoting Scrivener v. Clark College, 176 Wn. App. 405, 412, 309 P.3d 613 (2013)).

Viewing the evidence in the light most favorable to Davis, we conclude she has presented sufficient evidence to create a genuine issue of material fact that either the articulated reason for termination was pretextual, or that race or gender was a substantial factor in the decision to terminate her.

Davis presented evidence that she failed only one of the required practical exercises—the open skill make-up exercise. Corporal Spurling failed Davis in the open skill exercise and was a participant in the open skill make-up exercise. Corporal Spurling does not deny that before the open skill exercise, he told Davis that if she "was his wife or daughter,"[12] he would not want her to be a trooper. He also does not deny that during the high-risk stop practical exercise, he told Davis she "sound[ed] like a flight attendant."[13]

Under the "cat's paw" theory, the discriminatory animus of a nondecision-maker may be imputed to the decision-maker where the former has singular influence over the

---

[12] Emphasis omitted, internal quotation marks omitted.
[13] Emphasis omitted.

15

latter, and uses that influence to cause the adverse employment action. Staub v. Proctor Hosp., __ U.S. __, 131 S. Ct. 1186, 1190, 179 L. Ed. 2d 144 (2011). Although Captain Estes made the decision to terminate Davis, there is evidence that she relied heavily on Corporal Spurling's evaluation and his statement that Davis refused to review the videotape of her performance in the open skill exercise. According to Davis, Corporal Spurling told her the videotape failed to record correctly and, therefore, there was no point in watching it. Corporal Spurling's handwritten notes that day seem to support Davis's assertion. Corporal Spurling's notes state, "[A]sked if [Davis] wanted to see the video & she said no - (only 1/2 of the scene)."

Davis also presented evidence that male cadets, particularly Caucasian male cadets, had more opportunities to retake exams and practical exercises. Davis identifies a number of cadets who failed exams multiple times but were not terminated from the Academy.

The 2009 WSP Training Division Standard Operating Procedures Manual expressly provides for mandatory "retraining" if a cadet fails an exam: "a failure to pass any one of these practical examinations will result in four hours of retraining followed by a make-up exam." The 2009 Manual also states that "[i]f a student fails the make-up exam they may receive another four hours of retraining followed by another make-up exam; discretion of Academy Commander and/or designee." Contrary to the Manual, Davis states that she did not receive any retraining when she failed the practical exercises, whereas Caucasian male candidates received retraining before retests.

While Captain Lamoreaux states that the two Caucasian male cadets who also failed the open skill exercise both "received retraining similar to [Davis]," passed the

retest, and graduated, there is no evidence in the record that Davis received any "retraining" before retaking the practical exercise.[14]

In sum, viewing the evidence in the light most favorable to Davis, there are genuine issues of material fact as to pretext.

Hostile Work Environment Claim

Davis argues the court erred in dismissing her hostile work environment claim. Davis points to Corporal Spurling's comment that if she were his wife or daughter he would not want her to be a trooper cadet and his statement that she sounded like a flight attendant, as well as racist and sexist comments made by other cadets.[15]

To establish a prima facie hostile work environment claim, Davis must show (1) unwelcome harassment (2) that is attributable to her membership in a protected class (3) that affected the terms or conditions of her employment and (4) that can be imputed to her employer. Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275, 285 P.3d 854 (2012).

To prove the third element for a hostile work environment claim, Davis must establish that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." Glasgow v. Georgia-Pac. Corp., 103 Wn.2d 401, 406, 693 P.2d 708 (1985).

---

[14] As evidence that Davis was "repeatedly counseled" by Corporal Spurling about her poor performance, the WSP points to Corporal Spurling's handwritten note on the March 30 high-risk stop evaluation stating Davis "was counseled 2 times on this." Although Corporal Spurling's signature appears below this statement, the "cadet signature" line is blank.

[15] Davis additionally contends, "Corporal Lewis made several comments to me and other female candidates that were sexual in nature, such as 'was it as good for you as it was for me,' " that contributed to the hostile work environment. But there is nothing in the record about when he made these comments or his position at the Academy.

Whether the harassment creates an abusive working environment is determined by examining the totality of the circumstances. Sangster v. Albertson's, Inc., 99 Wn. App. 156, 163, 991 P.2d 674 (2000). Davis must also show the WSP knew or should have known of the comments and failed to take reasonable corrective actions to end the harassment. Glasgow, 103 Wn.2d at 407. Where an owner, manager, partner, or corporate officer personally participates in the harassment, the fourth element is met by proof of management status. Glasgow, 103 Wn.2d at 407. To automatically impute harassment to an employer, the manager's rank in the company hierarchy must be high enough that the manager is the employer's alter ego. Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 855-56, 991 P.2d 1182 (2000). This is a factual question. Delahunty v. Cahoon, 66 Wn. App. 829, 836-37, 832 P.2d 1378 (1992).

The WSP argues that Davis cannot establish a hostile work environment claim based on a few "stray comments" that were "spread out over the course of the Academy."

We conclude Davis fails to establish racist and sexist comments of fellow cadets should be imputed to the WSP. Davis states that after she was selected for Trooper Basic, other cadets told Davis that she "only made it through to basic" because she was "a black female." Davis told Corporal Laur about the comments. Corporal Laur confirmed her selection to Trooper Basic was based on her performance and volunteered to speak to the cadets. In response, Davis told Corporal Laur that she "would just handle it" herself.

Davis said that several weeks into Basic Training, other cadets joked that the Academy "had all the dark skinned cadets sitting at one table." Davis reported this

18

comment to Corporal Laur. Corporal Laur told Davis the comments were "unacceptable" and reported the comments to Sergeant Marrs-Hayes. It is undisputed that the cadet seating arrangements were changed shortly thereafter.

By contrast, if believed, the comments made by Corporal Spurling were unwelcome comments to an African American female cadet that arguably affected her performance and could be imputed to the WSP. Davis states that she felt "very belittled" by Corporal Spurling's statements and "offended" that he came to her dorm room to meet with her. Further, after she met with him, Davis performed poorly in the practical exercises that Corporal Spurling graded or in which he participated.

Washington is distinguishable. In Washington, we concluded that an employee failed to establish a hostile work environment claim because there was no evidence the isolated offensive conduct affected her work performance; in fact, the employee had been promoted. Washington, 105 Wn. App. at 10-11.

The WSP also argues Corporal Spurling was merely a member of the "training staff." But viewing the facts in the light most favorable to Davis, there is evidence that Corporal Spurling occupied a high-level position and played a significant role in the WSP Training Academy. Because there are material issues of fact about whether the comments made by Corporal Spurling affected the terms and conditions of Davis's employment, we reverse dismissal of the hostile work environment claim.

Retaliation

The law against discrimination prohibits retaliation against a person because that person opposed practices forbidden by the act. RCW 49.60.210(1). RCW 49.60.210(1) states, in pertinent part, "It is an unfair practice for any employer . . . to discharge, expel,

or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." The same McDonnell Douglas burden-shifting protocol applies to a claim for retaliation. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 137 P.3d 844 (2006).

To establish a prima facie case of retaliation, Davis must show (1) she engaged in statutorily protected activity, (2) WSP took some adverse employment action against her, and (3) there is a causal link between the employee's activity and the employer's adverse action. Estevez v. Faculty Club of Univ. of Wash., 129 Wn. App. 774, 797, 120 P.3d 579 (2005). The plaintiff need not show that retaliation was the only or "but for" cause of the adverse employment action. Allison v. Housing Auth. of Seattle, 118 Wn.2d 79, 95-96, 821 P.2d 34 (1991). However, the plaintiff must show that it was at least a "substantial factor" in the employer's decision to retaliate. Allison, 118 Wn.2d at 95-96.

Davis argues she was terminated for reporting to Corporal Laur the racist and sexist comments made by fellow cadets.[16] Reporting racist and sexist comments is a protected activity, and termination is an adverse action. Davis v. W. One Auto. Grp., 140 Wn. App. 449, 460, 166 P.3d 807 (2007).

But Davis presented no evidence showing a causal link between the comments she reported to Corporal Laur and termination. Davis first reported the comments to Corporal Laur while she was still in Arming and then again "[s]everal weeks into the

---

[16] The record also establishes that shortly after she was hired by the WSP in 2007, Davis filed a complaint about offensive comments made by coworkers. Insofar as Davis argues retaliation based on her complaint in 2007, there is no evidence that staff at the Academy knew about the complaint. Further, after Davis filed her complaint, she received consistently excellent performance evaluations and was selected to become a Trooper Cadet.

Trooper Basic Training class." After reporting the comments, Davis continued to receive positive evaluations from Corporal Laur. The record shows that no one other than Corporal Laur and Sergeant Marrs-Hayes knew Davis had reported the comments. Because there is no causal connection between Davis reporting the comments to Corporal Laur and the WSP's decision to terminate her in April 2010, we affirm summary judgment dismissal of the retaliation claim.

In sum, we affirm dismissal of the retaliation claim and the hostile work environment claim based on comments of other cadets, but reverse dismissal of the discrimination claim and the hostile work environment claim related to Corporal Spurling, and remand for trial.

WE CONCUR: