[No. 66071-3-I.   Division One.   April 2, 2012.]

SHARON HANKS, *Respondent*, v. JAMES GRACE ET AL., *Appellants*.

*Douglas S. Tingvall*, for appellants.

*Craig D. Blackmon* (of *Blackmon Holmes PLLC*), for respondent.

¶1 LEACH, C.J. — Sharon Hanks brought suit against her Realtor and his wife, James and Jeannie Grace (Grace), alleging professional negligence, legal malpractice, fraud, breach of contract, and a Consumer Protection Act[1] violation. Grace appeals from a jury verdict in Hanks's favor. Grace contends that Hanks waived her claims by signing a rescission contract containing an exculpatory clause, that the trial court improperly denied his motion for summary judgment, and that the trial court erred by denying his CR 50 motion for judgment as a matter of law. Under the facts of this case, the exculpatory clause violates public policy, the release is void, and the trial court properly concluded that Hanks did not waive her claims against Grace. Procedural bars prevent Grace from raising his remaining claims on appeal. We affirm.

## FACTS

¶2 On March 1, 2008, Hanks listed her house in Sammamish for sale for $538,000 with Grace and RE/MAX

---

[1] Ch. 19.86 RCW.

Eastside Brokers. At the time, Hanks's husband was terminally ill. Hanks planned to move to South Dakota after his death to be closer to her family. Hanks told Grace that she would not entertain contingent offers. The listing agreement provided that Grace would receive a two percent commission for his services as listing agent, which would increase to three percent if he also acted as the selling agent.

¶3 In early March, a prospective purchaser, Robert Alia, expressed an interest in Hanks's house to Grace, but Alia did not make a written offer. Instead, on March 10, Alia made an offer on a different house in Hanks's neighborhood. That same day, Grace presented Hanks with a written offer of $530,000 from Robert and Norma Jean Grimes. The Grimeses expressly conditioned their offer upon a satisfactory inspection and their ability to obtain financing. Hanks accepted the Grimeses' offer.

¶4 Grace then removed the "for sale" sign in front of Hanks's house without objection and changed the status of the house with the multiple listing service to "pending inspection." After the Grimeses approved an inspection, he changed it to "pending." Apparently unbeknownst to Hanks, the Grimeses' offer was contingent on the sale of their house.[2]

¶5 The purchase fell through when the Grimeses could not sell their house and as a result could not obtain financing.[3] Grace then offered to purchase Hanks's house. Grace asked Hanks to rescind the real estate purchase and sales agreement that she had entered into with the Grimeses. Grace prepared a rescission agreement that provided for the return of the Grimeses' earnest money to

---

[2] However, the real estate purchase and sale agreement (REPSA) was not expressly conditioned on the sale of the Grimeses' house. While Grace included a "Financing Addendum" to the REPSA, he failed to append "Form 22B," the "Buyer's Sale of Property Contingency Addendum."

[3] Grace also acted as the Grimeses' listing agent.

them and also contained an exculpatory clause, releasing Grace "from any and all present or future liability."

¶6 In June, the sale to Grace fell through because Grace, like the Grimeses, could not obtain financing. Hanks terminated her listing agreement with Grace and retained a different listing agent. By that time, the real estate market had significantly declined, forcing Hanks to reduce her asking price several times. Hanks's house eventually sold in September 2009 for $380,000, $158,000 less than the original asking price. Hanks sued Grace, alleging professional negligence, legal malpractice, fraud, breach of contract, and a Consumer Protection Act violation.

¶7 The record demonstrates that the parties disagree sharply about what occurred during the time that Grace acted as Hanks's listing agent. The first area of dispute centers on Alia, the individual who expressed an interest in Hanks's house but did not make an offer. Alia testified that he told Grace he wanted to make a full-price, noncontingent offer on Hanks's house and Grace responded that Alia's timing would not work for Hanks. Grace testified that Alia refused to make a written offer. According to Hanks, Grace never told her about Alia's desire to make an offer and, if he had, she would have accepted it.

¶8 The parties' recollection of events also differs regarding the Grimes offer. According to Hanks, Grace told her that the Grimeses were "financially well qualified." Hanks also said that Grace did not indicate to her that their offer was contingent upon the sale of their home. Grace, however, recalls alerting Hanks to the contingent nature of the offer.

¶9 Finally, the parties dispute what occurred at the signing of the rescission agreement. Grace remembers that he "went over the form with [Hanks]." Hanks, on the other hand, did not recall Grace explaining the terms of the agreement to her. She testified Grace told her that the rescission agreement was a formality and that she had to sign it so that Grace could buy her house.

¶10 Grace moved to dismiss Hanks's negligence claims on summary judgment, arguing Hanks had waived them by signing the rescission agreement. In the alternative, Grace asked the trial court to limit Hanks's damages to one-half of the Grimeses' $5,000 earnest money. The trial court decided that Grace owed Hanks no legal duty to prepare a written offer for Alia; it also determined that material issues of fact regarding Hanks's other claims precluded summary judgment.[4]

¶11 Hanks moved for partial summary judgment to dismiss Grace's waiver defense based upon the rescission agreement. The trial court granted this request:

> The release at issue in the facts presented to the court is void as a matter of public policy. In addition[,] there was no consideration, which is necessary to create an enforceable release. Accordingly, plaintiff's motion for partial summary judgment on this affirmative defense is hereby GRANTED. Defendants' affirmative defense of waiver is hereby dismissed with prejudice.

¶12 The parties tried the case to a jury. The jury received instructions on actual damages and emotional distress damages. The jury found that (1) Grace was not negligent in dealing with Alia, (2) Grace was negligent in the Grimes transaction, (3) Grace's negligence in the Grimes transaction proximately caused Hanks's damages, and (4) Grace did not breach his contract with Hanks to purchase her house. The jury awarded Hanks $195,000 in past economic damages and $170,000 in noneconomic damages.

¶13 After the verdict, Grace moved under CR 50 for judgment as a matter of law, arguing that insufficient evidence supported the jury's finding that Grace's negligence proximately caused Hanks's damages and that noneconomic damages are not recoverable in a negligence

---

[4] Here, the trial court ruled, "[T]here are genuine issues of material fact presented by this matter. Accordingly, defendants' motion for summary judgment is hereby DENIED."

action. The trial court denied Grace's motion and entered final judgment on the jury's verdict.

¶14  Grace appeals.

## ANALYSIS

*Did Hanks waive her claims against Grace?*

■■ ¶15  Grace claims the trial court erred by granting Hanks's motion for partial summary judgment. The trial court granted Hanks's motion after concluding that the rescission contract's exculpatory clause was invalid due to lack of consideration and that the release provision was void as a matter of public policy. Whether consideration supports a contract and whether a contractual provision contravenes public policy are questions of law, which we review de novo.

■ ¶16  First, we consider whether a lack of consideration made the release provision unenforceable. Generally, a contract must be supported by consideration.[5] In Washington, however, a contractual waiver can be unilateral and without consideration.[6] Therefore, the rescission contract's exculpatory clause does not fail due to lack of consideration.

■ ■ ¶17  Next, we address whether the exculpatory clause violated public policy. Washington courts generally accept, "subject to certain exceptions, [that] parties may contract that one shall not be liable for his or her own negligence to another."[7] However, "[t]here are instances where public policy reasons for preserving an obligation of care owed by one person to another outweigh our tradi-

---

[5] *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 178, 94 P.3d 945 (2004).

[6] *Panorama Residential Protective Ass'n v. Panorama Corp. of Wash.*, 97 Wn.2d 23, 28, 640 P.2d 1057 (1982) (citing *Gorge Lumber Co. v. Brazier Lumber Co.*, 6 Wn. App. 327, 335, 493 P.2d 782 (1972)).

[7] *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wn.2d 845, 848, 758 P.2d 968 (1988).

tional regard for freedom of contract."[8] As our Supreme Court recently acknowledged, "This court has analyzed express releases seeking to immunize a defendant for negligent breach of a duty imposed by law and found that these violate public policy."[9] We find such an instance here.

¶18 An agreement contravenes public policy if " 'the contract as made has a tendency to evil, to be against the public good, or to be injurious to the public.' "[10] In *Wagenblast v. Odessa School District No. 105-157-166J*,[11] our Supreme Court held that requiring students and their parents to sign an agreement releasing the school district from all potential future negligence claims as a condition of participating in interscholastic athletics violates public policy. The court identified and examined six characteristics common to invalid releases.[12]

> Under *Wagenblast*, the enforceability of a release depends on whether: (1) the agreement concerns an endeavor of a type thought suitable for *public regulation*; (2) the party seeking to enforce the release is engaged in performing *an important public service*, often one of practical necessity; (3) the party *provides the service to any member of the public*, or to any member falling within established standards; (4) the party seeking to invoke the release has *control over the person or property* of the party seeking the service; (5) there is a decisive

---

[8] *Scott v. Pac. W. Coast Mountain Resort*, 119 Wn.2d 484, 493, 834 P.2d 6 (1992).

[9] *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 637-38, 244 P.3d 924 (2010) (citing *Wagenblast*, 110 Wn.2d 845; *Vodopest v. MacGregor*, 128 Wn.2d 840, 913 P.2d 779 (1996)).

[10] *Marshall v. Higginson*, 62 Wn. App. 212, 216, 813 P.2d 1275 (1991) (internal quotation marks omitted) (quoting *Golberg v. Sanglier*, 27 Wn. App. 179, 191, 616 P.2d 1239 (1980), *rev'd on other grounds*, 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1982)).

[11] 110 Wn.2d 845, 852-56, 758 P.2d 968 (1988). Neither party cites this case.

[12] *Wagenblast*, 110 Wn.2d at 852-56.

*inequality of bargaining power* between the parties; and (6) the release is a standardized *adhesion contract*.[13]

The more of these characteristics present in a case, the more likely we are to declare the agreement invalid on public policy grounds.[14]

¶19 An examination of the *Wagenblast* characteristics present in this case demonstrates that the exculpatory clause under review violates Washington public policy. Chapter 18.85 RCW and chapter 18.86 RCW regulate the activities of real estate agents and brokers. These statutes govern licensing and define the duties and responsibilities of those who sell real estate. In addition, the Uniform Regulation of Business and Professions Act, chapter 18.235 RCW, prohibits real estate agents from engaging in unprofessional conduct, including "[i]ncompetence, negligence, or malpractice that results in harm or damage to another or that creates an unreasonable risk of harm or damage to another."[15]

¶20 Real estate agents and brokers provide an important service to the public. While an agent does not perform an essential service because a person can market his or her house without one, enlisting the help of an agent is often a matter of practical necessity. Real estate agents possess expertise that members of the general public generally do not. In recognition of this expertise, RE/MAX and its agents hold their services out to members of the public. After an agent and seller establish a relationship, the agent largely has control over the sale. While the seller controls the terms of the sale, the agent usually controls how the seller's goals are realized. In light of the foregoing considerations, characteristics one, two, three, and four are present.

---

[13] *Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wn. App. 334, 343, 35 P.3d 383 (2001).

[14] *Wagenblast*, 110 Wn.2d at 852.

[15] RCW 18.235.130(4).

¶21 Turning to the final characteristics—whether there was a decisive inequality in bargaining power between the parties and whether the terms were contained in a standardized adhesion contract—we also find these present in this case. A real estate agent, who regularly deals with and is familiar with the standardized forms used in residential real estate transactions, clearly has a superior bargaining power over a typical seller, who lacks sophistication and much experience in the business of buying and selling houses. Additionally, Grace supplied the release as part of a standard form contract published by the Northwest Multiple Listing Service. The parties did not discuss the clause, and Grace did not present Hanks with the opportunity to change the document. Hanks testified to her belief that she had no alternative but to sign. According to Hanks, Grace presented the rescission contract to her as the only option if she wanted to sell her house to another buyer, namely, him.

¶22 All of the six *Wagenblast* characteristics of an unenforceable exculpatory agreement are present in this case. Under these circumstances, the exculpatory clause violates public policy. The trial court did not err by dismissing Grace's waiver defense.[16]

*Did the trial court err by denying Grace's summary judgment motion?*

¶23 Grace challenges the trial court's denial of his summary judgment motion. We, however, will not review an order denying summary judgment when raised after a trial on the merits, where, as here, the denial is based on the presence of material, disputed facts.[17] "The primary purpose of a summary judgment procedure is to avoid a useless

---

[16] We note the parties analyze this issue in the context of *Marshall* and do not address *Wagenblast*. Because *Wagenblast* controls, we need not discuss their analysis.

[17] *Johnson v. Rothstein*, 52 Wn. App. 303, 304, 759 P.2d 471 (1988); *see also Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993).

trial."[18] Once a court holds a trial on the merits, reviewing the decision to deny a party's motion for summary judgment would do nothing to further this purpose.[19] Because this challenge is not properly before us, we do not consider the merits of Grace's substantive claims.

*Did the trial court err by denying Grace's motion for judgment as a matter of law?*

¶24 Grace claims that the trial court improperly denied his CR 50 motion for judgment as a matter of law. Again, a procedural bar precludes Grace from raising this issue on appeal. CR 50 permits a court to enter judgment as a matter of law if "during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue."[20] Regarding timing, CR 50 provides that "[a] motion for judgment as a matter of law may be made at any time *before submission of the case to the jury*."[21] If the trial court does "not grant a motion for judgment as a matter of law made at the close of all the evidence, . . . [t]he movant may *renew* its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment."[22] The rule makes clear that a party must move for judgment as a matter of law before the trial court submits the case to the jury to preserve any opportunity to renew its motion after the case is submitted.[23] Because Grace first moved for

---

[18] *Johnson*, 52 Wn. App. at 307.

[19] *Johnson*, 52 Wn. App. at 307.

[20] CR 50(a)(1).

[21] CR 50(a)(2) (emphasis added).

[22] CR 50(b) (emphasis added).

[23] Amendments in 2005 to CR 50 changed the rule, which before allowed a party to move for judgment as a matter of law after the case had been submitted to the jury " 'whether or not the party has moved previously for judgment as a matter of law.' " *Mega v. Whitworth Coll.*, 138 Wn. App. 661, 668-69, 158 P.3d 1211 (2007)

judgment as a matter of law after the jury's verdict, the trial court did not err by denying his untimely motion.

¶25 Grace argues that CR 50 is ambiguous because the rule states a party "may," rather than "must," move for judgment as a matter of law before submission of the case to the jury. This argument is not well taken. A rule is not ambiguous simply because it employs optional, rather than mandatory, language. Alternatively, Grace asks this court to excuse his noncompliance with CR 50 because it would "serve the ends of justice," citing *Scannell v. State*.[24] That case, however, involved a motion to extend time to file under RAP 18.8.[25] And there, unlike here, the appellant's tardiness was excusable based on his well-grounded confusion over a change in the appellate rules.[26] Grace has not demonstrated that he was unaware of the 2005 amendment to CR 50 or that a lack of this knowledge would be excusable. Because Grace failed to timely move for judgment as a matter of law, we do not review his claims' merits.

## CONCLUSION

¶26 Two procedural bars prevent Grace from challenging the trial court orders denying his motion for summary judgment and his CR 50 motion. And because Hanks did not

(quoting former CR 50(b) (1993)). The drafters explained the 2005 amendments to CR 50 as follows:

> This suggested amendment changes Washington practice and *requires* that a motion for judgment as a matter of law be made before submission of the case to the jury as a condition to renewing the motion post-verdict. The Committee concluded that requiring a motion for judgment as a matter of law before the case is submitted to the jury enhances the administration of justice because the parties and/or the court can correct possible errors before verdict. Absent such a motion before submission of the case to the jury, a party may not bring a motion for judgment as a matter of law thereafter.

4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 50 drafters' cmt. at 211 (5th ed. 2006).

[24] 128 Wn.2d 829, 912 P.2d 489 (1996).

[25] *Scannell*, 128 Wn.2d at 833-34.

[26] *Scannell*, 128 Wn.2d at 833-34.

waive her claim through the invalid release clause, we affirm.

Cox and APPELWICK, JJ., concur.

Review denied at 175 Wn.2d 1017 (2012).