IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DANNY DEASIS, a single person, | ) | |
| | ) | No. 31531-2-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YOUNG MEN'S CHRISTIAN | ) | |
| ASSOCIATION OF YAKIMA (YMCA), | ) | |
| a non-profit organization, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Danny DeAsis, a member of the Young Men's Christian

Association of Yakima (YMCA), slipped and fell on a puddle of water in a hallway

outside the pool office, resulting in a dislocated knee. He appeals the summary judgment

dismissal of his claims of negligence and gross negligence, arguing that a release and

waiver that he signed upon becoming a member was unenforceable and that genuine

issues of disputed fact require trial. We disagree and affirm.

FACTS AND PROCEDURAL BACKGROUND

Danny DeAsis applied for membership in the Yakima YMCA in late 2010 on its

two-sided membership application form. He completed the front side with required

personal and credit card information. The back side of the form is printed with a full-

page agreement, the greater part of which is captioned "RELEASE and WAIVER of

LIABILITY and INDEMNITY AGREEMENT," at the conclusion of which is the language "I HAVE READ AND UNDERSTAND THIS DOCUMENT AND RELEASE," followed by a line for the applicant's signature and the date. Clerk's Papers (CP) at 19 (boldface omitted). Mr. DeAsis failed to sign and date the back side of the form. If the release and waiver has not been signed, procedure requires YMCA employees to flag the member's account so that his or her card will not work when the member swipes it through a scanner to open the locker room door. When the member seeks assistance at the front desk, personnel are able to pull up a message that the application form was not fully completed, and obtain a signature at that time.

YMCA records indicate that when Mr. DeAsis returned the day after partially completing the application form, his membership card did not open the locker room door. He apparently was presented with the release and waiver agreement and signed it. He admits that the signature on the release and waiver agreement is his, but testified in deposition that he did not read the document before signing it.

Approximately nine months later, Nathan Vanderhoof, the aquatics supervisor at the YMCA, was working when he noticed a swimmer who had just left the pool, was apparently having trouble finding the locker room, and had dripped water down the hallway outside the pool office door. Mr. Vanderhoof opened a locked door that would lead the swimmer back to the locker room and then, in order to clean up the water, headed to the pool office where he knew there were towels. Just as he was bringing the

2

towels back, he saw Mr. DeAsis, who was leaving the building after his workout, slip and fall on the wet floor. Mr. DeAsis was taken to the hospital, where he was diagnosed with a dislocated kneecap.

Mr. DeAsis sued the YMCA for negligence. Following discovery, the court heard the YMCA's motion for summary judgment and Mr. DeAsis's motion for partial summary judgment. Faced with the YMCA's argument that his negligence action was barred by the release and waiver, Mr. DeAsis requested leave during argument of the motion to amend his complaint to allege gross negligence. The court granted the motion but still granted the YMCA's motion and dismissed his claims. After Mr. DeAsis's motion for reconsideration was denied, he filed this appeal.

## ANALYSIS

Mr. DeAsis's assignments of error present essentially two issues. He argues first that the release and waiver he signed is unenforceable, and second that, properly considered, the evidence he presented raised a genuine issue of material disputed fact. We address the enforceability of the release and waiver first and then turn to the propriety of summary judgment dismissal of his complaint.

### I. Enforceability of release and waiver

A release is a contract in which one party agrees to abandon or relinquish a claim, obligation, or cause of action against another party. *Boyce v. West*, 71 Wn. App. 657, 662, 862 P.2d 592 (1993) (citing 6 MARILYN MINZER, JEROME H. NATES, CLARK D.

3

KIMBALL, & DIANA T. AXELROD, DAMAGES IN TORT ACTIONS § 51.11[3], at 51-9 (1991)). Under Washington law an exculpatory contract clause is valid unless it (1) violates public policy, (2) the defendant's breach constitutes gross negligence, or (3) the clause is so inconspicuous that a reasonable person could find it was signed unwittingly. *McCorkle v. Hall*, 56 Wn. App. 80, 782 P.2d 574 (1989). Mr. DeAsis asserts that all three exceptions apply to render the release that he signed unenforceable.

We review summary judgment decisions de novo, performing the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004) (citing *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993)). Summary judgment will be upheld if the pleadings, affidavits, answers to interrogatories, admissions, and depositions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002); CR 56(c). The court reviews all facts and reasonable inferences from the facts in a light most favorable to the nonmoving party. *Jones*, 146 Wn.2d at 300.

Turning first to the public policy exception, ordinarily public policy does not prevent parties from releasing one or the other from liability for negligence. *Shields v. Sta-Fit, Inc.*, 79 Wn. App. 584, 586, 903 P.2d 525 (1995) (citing *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wn.2d 845, 848, 758 P.2d 968 (1988)). *Wagenblast* sets forth six factors, taken from *Tunkl v. Regents of University of California*, 60 Cal. 2d

92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963) that are considered in determining whether

exculpatory agreements violate public policy:

> Whether
>
> (1) the agreement concerns an endeavor of a type generally thought suitable for public regulation;
>
> (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public;
>
> (3) such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards;
>
> (4) because of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks the services;
>
> (5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; and
>
> (6) the person or property of members of the public seeking such services must be placed under the control of the furnisher of the services subject to the risk of carelessness on the part of the furnisher, its employees, or agents.

*See Boyce*, 71 Wn. App. at 663-64 (citing *Wagenblast*, 110 Wn.2d at 851-55).

"[T]he more of the . . . six characteristics that appear in a given exculpatory

agreement case, the more likely the agreement is to be declared invalid on public

policy grounds." *Wagenblast*, 110 Wn.2d at 852. Whether a release contravenes

public policy is a question of law, which we review de novo. *Hanks v. Grace*, 167

Wn. App. 542, 548, 273 P.3d 1029, *review denied*, 175 Wn.2d 1017 (2012).

5

In *Shields*, this court considered a release of liability required as a condition of joining a health club. Paul Shields, who had been required upon joining Sta-Fit to release it and its employees from any negligence or fault, was injured when a Sta-Fit employee, a trainer, instructed him to remove his support belt when performing squats. *Shields*, 79 Wn. App. at 586. The court found that cases holding that exculpatory agreements are void against public policy generally deal with essential services—hospitals, housing, public utilities, and public education. *Id.* at 589. After considering *Wagenblast*'s six factors, the court held that a gym is not subject to the public policy exception. *Id.* at 590.

Mr. DeAsis asks us to reconsider *Shields*. When a judicial conclusion of the past that established a public policy comes before the courts, accepted assumptions should be reexamined in the light of current conditions and thinking. *Wyman v. Wallace*, 15 Wn. App. 395, 396, 549 P.2d 71 (1976) (citing *Pierce v. Yakima Valley Mem. Hosp. Ass'n*, 43 Wn.2d 162, 260 P.2d 765 (1953)), *aff'd*, 94 Wn.2d 99, 615 P.2d 452 (1980). Although *Shields* was decided nearly 20 years ago, we recently reaffirmed that "Washington courts have not favored finding a public interest in adult recreational activities." *Johnson v. Spokane to Sandpoint, LLC*, 176 Wn. App. 453, 460, 309 P.3d 528 (2013). *Shields* had reasoned that the public interest is not implicated by a health club's requirement that members sign a release of liability, because while health club membership is "beneficial" it is a "far cry from declaring health clubs an indispensable necessity as a matter of public policy." *Shields*, 79 Wn. App. at 588-89. Gyms and health clubs make available the

6

same opportunity for improving health and physical condition today as they did 20 years ago. They still fall outside the "essential services" context in which we would refuse to enforce an exculpatory agreement. The YMCA's release is not unenforceable on grounds of public policy.

Mr. DeAsis next argues the release is unenforceable because it is not conspicuous. He cites *Johnson v. Ubar, LLC*, 150 Wn. App. 533, 210 P.3d 1021 (2009), characterizing it as holding that "[w]hen the plaintiff testifies that the exculpatory clause is inconspicuous, a question of fact is created." Br. of Appellant at 14. That is not a fair characterization of *Ubar*, which in fact held that "[b]ased on [the health club's] membership agreement, we conclude that reasonable persons could disagree as to whether the waiver provision is conspicuously displayed." 150 Wn. App. at 542. It was significant to the *Ubar* court that the membership agreement at issue included some provisions that were made conspicuous by use of capital letters and bold print, but "all the provisions that [were] called to the attention of the reader in the membership agreement concern[ed] financial terms." *Id.* In surveying pertinent Washington cases, *Ubar* cites several in which the appellate court concluded that summary judgment was properly granted because reasonable persons could not reach different conclusions as to whether the waiver and release provision was inconspicuous. *Id.* at 539-40 (citing *Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wn. App. 334, 35 P.3d 383 (2001); *Stokes v. Bally's Pacwest, Inc.*, 113 Wn. App. 442, 54 P.3d 161 (2002)).

7

Whether an exculpatory clause can be found conspicuous as a matter of law turns on how many of the characteristics that make a provision conspicuous are present: characteristics such as setting it apart from other provisions, using a heading or caption that makes the purpose of the provision clear, whether the provision or its heading or caption set forth in capital letters or in bold type, whether there is a signature line, and whether it is clear that the required signature is related to the exculpatory provision. *See Baker v. City of Seattle*, 79 Wn.2d 198, 484 P.2d 405 (1971); *McCorkle*, 56 Wn. App. at 83; *Chauvlier*, 109 Wn. App. at 342; *Stokes*, 113 Wn. App. at 448.

The release at issue in *Chauvlier* was printed on a ski pass application. It was not hidden within part of a larger agreement, and it was clearly entitled "'LIABILITY RELEASE & PROMISE NOT TO SUE. PLEASE READ CAREFULLY!'" 109 Wn. App. at 342. Also included were the words "'RELEASE'" and "'HOLD HARMLESS AND INDEMNIFY'" set off in capital letters throughout the agreement, and the release contained the language, just above the signature line, "'Please Read and Sign: I have read, understood, and accepted the conditions of the Liability Release printed above.'" *Id.* Summary judgment that the release was conspicuous and enforceable was affirmed.

At the other end of the spectrum are *Baker*, *McCorkle*, and *Johnson*. In *Baker*, the Supreme Court held as a matter of law that a disclaimer in a golf cart rental agreement was unconscionable and unenforceable where it consisted of several lines of release language in the middle of a paragraph dealing with something else, and "would have

been observed only by reading the entire agreement." *Baker*, 79 Wn.2d at 200. In *McCorkle* and *Johnson*, the appellate courts concluded that the issue of conspicuousness required trial. We have already discussed the court's concerns in *Johnson*. In *McCorkle*, the release language was included in a paragraph with the ambiguous caption, "'LIABILITY STATEMENT.'" 56 Wn. App. at 81. The court contrasted the agreement in *McCorkle* with release provisions in two earlier cases that were deemed conspicuous because they were set off by an unambiguous caption or otherwise, and because they drew the attention of the party signing the document to the fact of the release with language immediately above the signature line. *Id.* at 83-84 (citing *Hewitt v. Miller*, 11 Wn. App. 72, 78, 521 P.2d 244 (1974); *Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 850, 728 P.2d 617 (1986)). It was because the release in *McCorkle* was so much easier to overlook than those in *Hewitt* and *Conradt* that this court concluded there was a genuine issue of material fact whether it was so inconspicuous that the plaintiff unwittingly signed it. *Id.* at 84.

The YMCA's membership agreement at issue in this case has all of the characteristics that have been relied upon in finding, as a matter of summary judgment, that no reasonable jury could find release language to be inconspicuous. Both the release and waiver agreement and its several sections are set apart by the use of boldface print or capital letters, it contains repeated cautionary and warning language, and it states, above

the signature line, "I HAVE READ AND UNDERSTAND THIS DOCUMENT AND RELEASE." There is no issue of fact as to conspicuousness that requires trial.

Even if the document is conspicuous in its format, Mr. DeAsis argues that the language of the release is confusing and ambiguous and "[n]owhere in the three paragraphs does YMCA state that it is being released from its own negligence." Reply Br. of Appellant at 9. We disagree; the first paragraph contains language releasing the YMCA and its directors, officers, employees, and agents, "hereafter referred to as 'releasees'" from all liability "whether caused by the negligence of the releasees or otherwise." CP at 19. And even if it did not disclose that it was being released from liability for its own negligence, courts use common sense in interpreting purported releases. *Cf. Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 491, 834 P.2d 6 (1992) (use of the word "negligent" is not essential). The language of the YMCA's release and waiver provision clearly conveys the parties' intent to shift the risk of loss. *Id.*

Elsewhere, Mr. DeAsis argues that summary judgment was inappropriate where the "defendant's actions created a scenario that caused the plaintiff to become unaware that he was signing a waiver," Br. of Appellant at 13, and that he did not know what he was signing "because of the way YMCA presented the document." Reply Br. of Appellant at 11. We presume these are references to the fact that, because Mr. DeAsis failed to sign the release and waiver initially, it was presented for his signature at a later time. He fails to explain how the circumstances of his signing interfered with his ability

10

to understand the agreement; he has presented no evidence that he was denied the opportunity to read it or was misled about its terms. "[A] person who signs an agreement without reading it is bound by its terms as long as there was 'ample opportunity to examine the contract in as great a detail as he cared, and he failed to do so for his own personal reasons.'" *Chauvlier*, 109 Wn. App. at 341 (internal quotation marks omitted) (quoting *Nat'l Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 913, 506 P.2d 20 (1973)).

Finally, Mr. DeAsis argues that the release is an unenforceable adhesion contract. Whether a contract is an adhesion contract turns on (1) whether the contract is a standard form printed contract, (2) whether it was prepared by one party and submitted to the other on a "take it or leave it" basis, and (3) whether there was no true equality of bargaining power between the parties. *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 304, 103 P.3d 753 (2004). To the extent that the characterization of a contract as an adhesion contract has any relevance to determining the validity of a contract, it is only in looking for procedural unconscionability; the fact that an agreement is an adhesion contract does not necessarily render it procedurally unconscionable. *Id.*

Whether a release and waiver is included in an adhesion contract is one of the *Wagenblast* factors considered in determining whether it violates public policy; in *Shields*, this court held that the health club membership contract in that case was "clearly one of adhesion," 79 Wn. App. at 590, and the same is true here. As we reasoned in

11

*Shields*, "the true concern is the disparate bargaining power. And that in turn is related to the essential nature of the services being provided." *Id.* As discussed above, a health club is not essential. People interested in recreation and exercise have many alternatives. The "take it or leave it" nature of the YMCA membership agreement does not render it unenforceable.

Because the release and waiver provision is valid and enforceable, Mr. DeAsis's negligence claim was properly dismissed.

## II. Summary judgment dismissal of gross negligence claim

Preinjury releases are only enforceable to the extent that they exculpate tortfeasors for *negligent* acts, and are not otherwise in violation of public policy. Washington courts have for decades found preinjury releases that purport to extend to gross negligence and intentional torts unenforceable. *Boyce*, 71 Wn. App. at 665; *McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 447, 486 P.2d 1093 (1971). In dismissing Mr. DeAsis's claim of gross negligence, the trial court concluded that he had failed to demonstrate a genuine issue of material fact supporting the YMCA's asserted breach of the applicable standard of care.

Before turning to what Mr. DeAsis advances as sufficient evidence of gross negligence, we address his argument that because he was a business invitee the YMCA owed him a heightened duty of care that was overlooked by the trial court. There is no question that Mr. DeAsis was an invitee (as releasors often are) and, but for his release of

12

the YMCA from liability, his status as invitee would dictate the standard of care.[1] He voluntarily released the YMCA from liability, however, and therefore must establish at least gross negligence to overcome the effectiveness of the release. Nothing about Mr. DeAsis's status as a business invitee alters the analysis.

Mr. DeAsis submits that gross negligence claims should never be dismissed on summary judgment, arguing that "[t]here are literally dozens of Washington cases that specifically hold that the issue of whether negligence rises to gross negligence presents a question of fact for the jury, and is not properly decided by the judge on summary judgment." Br. of Appellant at 7. But the cases on which he relies are those presenting *"substantial evidence* of acts or omissions *seriously negligent in character,"* in which the fact question presented was where, on the spectrum between seriously negligent and grossly negligent, a defendant's conduct fell. *Nist v. Tudor*, 67 Wn.2d 322, 326, 407 P.2d 798 (1965) (emphasis added). It is in those cases that the Washington Supreme Court had, as of 1965, "inclined toward leaving the question of gross negligence to the jury." *Id.* In cases that do not present substantial evidence of acts or omissions that are seriously negligent in character, this court will affirm summary judgment dismissal of a

---

[1] Businesses owe their invitees a duty to exercise reasonable care and inspect for dangerous conditions, "'followed by such repair, safeguards, or warning as may be reasonably necessary for [the invitee's] protection under the circumstances.'" *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 139, 875 P.2d 621 (1994) (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 343 cmt. b (1965)).

claim of gross negligence. *See, e.g., Johnson*, 176 Wn. App. at 460.

The YMCA, as the party moving for summary judgment, bore the initial burden of demonstrating that there was no genuine issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). With the YMCA having demonstrated apparently nonnegligent conduct on the part of Mr. Vanderhoof, it was incumbent on Mr. DeAsis to present evidence that material facts are in dispute.

The undisputed evidence is that Mr. Vanderhoof observed the water being dripped onto the hallway floor as it occurred and, at his earliest opportunity, went directly to his office to retrieve towels in order to wipe it up. The towels were "only a couple steps away." CP at 146. Mr. DeAsis's argument is that there were other, perhaps better courses of action available: he submits that Mr. Vanderhoof could have obtained a safety cone to mark the hazard, or could have stood in the hallway to caution anyone coming through. Yet Mr. Vanderhoof testified that it would have taken him longer to get a cone than to get the towels, and Mr. DeAsis presents no contrary evidence.

"Gross negligence" has been defined as "'negligence substantially and appreciably greater than ordinary negligence,' i.e., 'care substantially or appreciably less than the quantum of care inhering in ordinary negligence.'" *Johnson*, 176 Wn. App. at 460 (quoting *Nist*, 67 Wn.2d at 331); *see* 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.07 (6th ed. 2012) ("gross negligence" is "the failure to exercise slight care"). To meet this burden of proof on summary judgment, the plaintiff

must offer something more substantial than mere argument that the defendant's breach of care arises to the level of gross negligence. CR 56(e); *Boyce*, 71 Wn. App. at 666.

Mr. DeAsis did not present anything approaching substantial evidence of acts or omissions seriously negligent in character. No reasonable jury could have found the YMCA grossly negligent. Summary judgment was appropriate.[2]

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Korsmo, J.

Fearing, J.

---

[2] We need not address Mr. DeAsis's contention that the trial court's analytic approach improperly included weighing evidence because we are engaged in de novo review. We decide independently whether a genuine issue of fact required trial.