# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RUTHIE JABLONSKY, individually,<br><br>Appellant,<br><br>v.<br><br>RECREATIONAL EQUIPMENT, INC. d/b/a REI, a Washington for-profit Corporation, JOHN DOES 1-10; and ABC Corporations 1-10,<br><br>Respondents. | No. 86797-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Ruthie Jablonsky appeals summary judgment dismissal of her negligence claim against Recreational Equipment Inc. (REI), related to REI's servicing of Jablonsky's bike. Jablonsky argues the trial court erred by determining the release of liability in the Bike Maintenance Agreement (the agreement) barred her claim. Because the agreement was sufficiently conspicuous, and did not violate public policy, we affirm.

I

On August 21, 2020 Jablonsky brought her bike to the Spokane REI store for servicing. Jablonsky signed a Bike Maintenance Agreement (the agreement) for the tune-up service which consisted of a front and back page. Jablonsky did not read the back page. REI performed the tune-up and Jablonsky picked up the bike a few days

later. After Jablonsky picked up the bike, she rode it once to commute from her home to Gonzaga Law School where she was a first-year law student.

On August 29, 2020, Jablonsky and her husband, Benjamin Feldman, were riding their bikes on the Centennial Trail in Spokane. About 45 minutes into the ride, Jablonsky was riding uphill out of the saddle when her bike stopped and she crashed onto her left side. Jablonsky realized that the wheel of her bike had come off and the rear axle skewer was loose.

Jablonsky suffered abrasions on her leg and one or two days after the crash she sought medical treatment. Jablonsky was diagnosed with a concussion and suffered several symptoms including fatigue, brain fog, dizziness, vestibular issues, headaches, and neck pain. Jablonsky took a leave of absence from law school.

Shortly after the crash, Feldman took the bike back to REI. REI replaced the handlebars and Jablonsky's helmet. REI verbally told Feldman that they also replaced the rear axle skewer.

On March 2, 2023, Jablonsky sued REI for negligence and sought damages for personal injuries, loss of income, loss of earning capacity, pain and suffering, disability, disfigurement, loss of enjoyment of life, and mental and emotional distress. Jablonsky alleged REI breached its duty by returning the bike in an unsafe condition and asserted the inference of negligence under res ipsa loquitor.

REI denied any negligence and asserted Jablonsky failed to state a claim upon which relief may be granted and that the claim was barred because Jablonsky released REI from all liability.

Following discovery, REI moved for summary judgment.  At the hearing on the motion, the trial court concluded Jablonsky did not meet the burden of proof and the waiver of liability was valid and enforceable.  On May 31, 2024, the trial court granted summary judgment for REI and incorporated its oral ruling in the order.

Jablonsky appeals.

II

This court reviews summary judgment orders de novo and performs the same inquiry as the trial court.  Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).  All facts and reasonable inferences are viewed in the light most favorable to the nonmoving party—in this case, Jablonsky.  Owen, 153 Wn.2d at 787.  Summary judgment is proper if the record before the trial court establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  CR 56(c).

Jablonsky argues REI was negligent in returning the bike to her in an unsafe condition.

"Negligence requires proof of four elements: (1) the existence of a duty to the person alleging negligence, (2) breach of that duty, (3) resulting injury, and (4) proximate cause between the breach and the injury."  Nguyen v. City of Seattle, 179 Wn. App. 155, 164, 317 P.3d 518 (2014).  "Whether there is a duty of care is a question of law."  Chauvlier v. Booth Creek Ski Holdings, Inc., 109 Wn. App. 334, 339, 35 P.3d 383 (2001).  Under Washington law, parties may expressly "agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent."  Chauvlier,

109 Wn. App. at 339 (quoting <u>Wagenblast v. Odessa Sch. Dist. No. 105-157-166J</u>, 110 Wn.2d 845, 848, 758 P.2d 968 (1988)).  There are three exceptions to such exculpatory agreements: (1) a release that is inconspicuous, (2) a release that violates public policy, or (3) the negligent act falls greatly below the legal standard for protection of others. <u>Chauvlier</u>, 109 Wn. App. at 339.

At issue here are the first two exceptions.  We address each in turn.

A

Jablonsky argues the release was so inconspicuous that it is void.  She relies on <u>Baker v. City of Seattle</u>, 79 Wn.2d 198, 484 P.2d 405 (1971), <u>McCorkle v. Hall</u>, 56 Wn. App. 80, 782 P.2d 574 (1989), and <u>Johnson v. UBAR, LLC</u>, 150 Wn. App. 533, 210 P.3d 1021 (2009).

An exculpatory agreement is unenforceable if "the releasing language is so inconspicuous that reasonable persons could reach different conclusions as to whether the document was unwittingly signed."  <u>Stokes v. Bally's Pacwest, Inc.</u>, 113 Wn. App. 442, 446, 54 P.3d 161 (2002).  "But a person who signs an agreement without reading it is bound by its terms as long as there was "ample opportunity to examine the contract in as great a detail as [they] cared, and [they] failed to do so for [their] own personal reasons."  <u>Chauvlier</u>, 109 Wn. App. at 341.  "Where reasonable persons could reach only the conclusion that the release language is conspicuous, there is no question of the document having been unwittingly signed."  <u>Stokes</u>, 113 Wn. App. at 446.

Washington courts have identified several factors to consider when deciding whether a release is conspicuous:

> whether the waiver is set apart or hidden within other provisions, whether the heading is clear, whether the waiver is set off in capital letters or in bold type, whether there is a signature line below the waiver provision, what the language says above the signature line, and whether it is clear that the signature is related to the waiver.

Johnson, 150 Wn. App. at 538 (citing Baker, 79 Wn.2d at 202, McCorkle, 56 Wn. App. at 83, Chauvlier, 109 Wn. App. at 342, and Stokes, 113 Wn. App. at 448).

In Baker, our Supreme Court concluded that a release contained in the middle of an agreement for a golf cart rental was unenforceable as a matter of public policy. 79 Wn.2d at 200-01. The court concluded it would be unconscionable to enforce the release because it was not conspicuous and it "would have been observed only by reading the entire agreement." 79 Wn.2d at 199-200, 202. Baker established relief for those who unwittingly sign an inconspicuous exculpatory agreement.

In McCorkle, Division Three of this court analyzed an exculpatory agreement within a gym membership application that McCorkle did not read before signing. 56 Wn. App. at 81. In that case, the releasing language was in the middle of the agreement similar to Baker. McCorkle, 56 Wn. App. at 81. But, in contrast to Baker, the language was set off by a heading which read "LIABILITY STATEMENT." McCorkle, 56 Wn. App. at 81. The court remanded for trial on the issue of "whether the disclaimer language was so conspicuous that he could not have unwittingly signed the application." McCorkle, 56 Wn. App. at 84.

In Chauvlier, this court distinguished Baker and determined the exculpatory agreement to be sufficiently conspicuous for these reasons:

> the release here was not hidden within part of a larger agreement. Rather, it is clearly entitled "LIABILITY RELEASE & PROMISE NOT TO SUE. PLEASE READ CAREFULLY!" Second, the words "RELEASE" and

"HOLD HARMLESS AND INDEMNIFY" are set off in capital letters throughout the agreement. Third, like the release in <u>Hewitt</u>, the release here contains the following language just above the signature line: "Please Read and Sign: I have read, understood, and accepted the conditions of the Liability Release printed above."

109 Wn. App. at 342. <u>See also</u> <u>Stokes</u>, 113 Wn. App. at 448-50 (a court concluded an exculpatory agreement to be conspicuous where it included "waiver and release" in bold and capital type immediately following the signature line).

In <u>Johnson</u>, the releasing language was set apart and included a signature line. But the language was located amid financial terms and in the same small font as the rest of the agreement. 150 Wn. App. at 541-42. This court distinguished <u>Chauvlier</u>, and concluded "that reasonable persons could disagree as to whether the waiver provision is conspicuously displayed." <u>Johnson</u>, 150 Wn. App. at 542.

In this case, the front of the agreement contains the following provisions directly above the signature line:

READ THE BACK OF THIS AGREEMENT FOR OTHER IMPORTANT LEGAL INFORMATION. By signing below YOU ACCEPT ALL TERMS OF THIS AGREEMENT including the <u>RELEASE OF LIABILITY</u> on the back of this form.

- I understand the extent of the repairs or maintenance recommended above, if any, and the consequences if not performed in a timely manner
- REI is not responsible for items left more than 30 days after work is completed
- The need to wear a bike helmet while riding and the consequences of not wearing one
- The need for bicycle lights and additional reflectors for night riding
- Proper shifting and brake use
- The proper use and adjustment of the quick release mechanisms
- The need for regular bicycle maintenance

I HAVE FULLY INFORMED MYSELF ON THE CONTENTS OF THIS AGREEMENT INCLUDING BUT NOT LIMITED TO THE <u>WARNING AND</u>

RELEASE OF LIABILITY ON THE BACK OF THIS FORM BY READING IT BEFORE SIGINING IT.  No oral representations or other inducements to sign this RELEASE OF LIABILITY have been made apart from what is contained in this two-sided form.

The back of the agreement begins with the following heading: "WARNING AND RELEASE OF LIABILITY: PLEASE READ CAREFULLY BEFORE SIGNING."  The first section describes the risks associated with cycling and provides that the signer understands those risks.  In the second section, the signer assumes those risks:

> I hereby assume the risk of all of the above-mentioned risks, hazards and dangers, and any harm, injury or loss that may occur to me or my property as a result of my use of the bike—including, but not limited to, any risks, hazards or dangers caused by the negligence of any REI employee or by any other individual.

The third and fourth section of the agreement contain the waiver and indemnification language:

> SECTION 3: RELEASE OF LIABILITY
>
> I hereby RELEASE REI, the manufacturer and distributors of the bike, and their employees, officers, directors, shareholders and owners (the "Released Parties") from all liabilities, causes or action, claims and demands that arise in any way from any injury, death, or loss or harm that I sustain or that any other person or any property sustains as a result of my use of this bike and any other equipment supplied, maintained, and/or adjusted by REI.  This RELEASE includes, but is not limited to, claims based on: negligence; defects in the design, manufacture, adjustment, maintenance or inspection of the bike and related equipment; and failure to provide proper instruction, technical direction, or safety equipment.  I agree NOT TO SUE or make a claim against the Released Parties for injuries or damages relating to my use of the bike and related equipment.
>      . . . .
> SECTION 4: INDEMNIFICATION, HOLD HARMLESS AND DEFEND
>
> I promise to INDEMNIFY, HOLD HARMLESS AND DEFEND the Released Parties (defined in Section 3) against any and all claims to which Section 3 of this agreement applies, including claims for their own negligence.  I also promise to INDEMNIFY, HOLD HARMLESS AND

> DEFEND the Released Parties against any and all claims of my own negligence, and any other claim arising from my use of the bike.

Here, the language in the agreement is more like the release in Chauvlier than in Baker, Johnson, and McCorkle. The release is not hidden within a larger agreement and is instead clearly titled and set apart. The agreement capitalizes and underlines "release of liability" three times in the signature block and again at the top of the back page. The signature block instructs the signer to read the back of the agreement and states that the warning and release is on the back. On the back page, the heading warns the signer and instructs to "read carefully before signing," and the terms "release" and "indemnify, hold harmless, and defend" are capitalized throughout. And there is no evidence that Jablonsky was rushed to sign the agreement.

A reasonable person could reach only the conclusion that the release language is conspicuous and Jablonsky did not unwittingly sign the agreement.

B

Jablonsky argues the release is void for public policy reasons.

In Wagenblast, 110 Wn.2d at 851-52, our Supreme court identified six non-exclusive characteristics or factors commonly found in releases that violate public policy: (1) it concerns a business that is generally suitable for public regulation, (2) the party seeking exculpation is engaged in performing a service of great importance to the public, often one of practical necessity (3) the selling party provides the service to any member of the public or to those meeting a certain standard, (4) the selling party possesses a bargaining advantage, (5) in exercising a superior bargaining power, the selling party offers a standardized adhesion contract of exculpation, and makes no

provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence, and (6) as a result of the transaction, the selling party has control over the person or property.

"The more of these characteristics present in a case, the more likely we are to declare the agreement invalid on public policy grounds." Hanks v. Grace, 167 Wn. App. 542, 550, 273 P.3d 1029 (2012) (citing Wagenblast, 110 Wn.2d at 852).

Jablonsky concedes the first factor is not present—bike repair is not subject to public regulation. And the parties do not dispute the presence of the third and fifth factor, that REI offers services to the public and the use of nonnegotiable standardized contract. Accordingly, we must consider whether the second, fourth, and sixth factors are present.

Jablonsky argues that bike repair is of great importance to the public and points to the governor's designation of bike repair and maintenance facilities as essential during COVID.

"One of the important characteristics that Washington cases have identified when deciding if exculpatory clauses violate public policy is the practical importance of the activity in question." Vodopest v. MacGregor, 128 Wn.2d 840, 858, 913 P.2d 779 (1996). In other words, we must consider whether the party seeking exculpation is providing an important public service, such as education or medical services. See Wagenblast, 110 Wn.2d at 853-54 (a court held interscholastic sports are a matter of public importance as "part and parcel of the overall education system."); Vodopest, 128 Wn.2d at 859 (a court concluded medical research is a matter of public importance). In Hanks, this court determined that real estate agents and brokers provide an important

service to the public and their services are often sought as a "matter of practical necessity," because "real estate agents possess expertise that members of the general public generally do not." 167 Wn. App. at 550.

In contrast, recreational activities such as skiing are not essential or of practical necessity. See Chauvlier, 109 Wn. App. at 344-45 (determining the second factor absent in an exculpatory agreement between skier and a recreational ski area); see also Petersen v. Sorensen, noted at 118 Wn. App. 102, 2003 WL 22040908 at *5, (holding the activity of motorcycle training is not a matter of great public importance)[1]. Similarly, health club services "are not essential to the welfare of the state or its citizens." Shields v. Sta-Fit, Inc., 79 Wn. App. 584, 589, 903 P.2d 525 (1995).

Even though the governor designated bike maintenance facilities to remain open during COVID, we cannot say that bike repair and maintenance is an important and necessary public service on par with the education system or medical research. And while REI has expertise and offers a service that many use out of practical necessity, bike repair and maintenance cannot reasonably be compared to real estate services as discussed in Hanks. While both may involve a certain level of expertise, the real estate services in Hanks are regulated by statute and agents and brokers are subject to rules of professional conduct. 167 Wn. App. at 550. We must consider the Wagenblast factors in light of the specific facts before us and, in this case, the second factor is not present.

---

[1] We generally do not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in our decisions. GR 14.1(c). But we may cite unpublished opinions of this court filed on or after March 1, 2013 as nonbinding authorities and accord such persuasive value as we deem appropriate. GR 14.1(a).

Next, Jablonsky briefly argues the fourth factor is present because the standardized agreement is nonnegotiable and REI holds itself out to be experts in bike repair.

Our consideration of the fourth factor—an advantage of bargaining power—is tied to the second factor and whether the nature of the service is essential. "As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services." Wagenblast, 110 Wn.2d at 851 (quoting Tunkl v. Regents of Univ. of Cal., 60 Cal.2d 92, 98-101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963)). In Wagenblast, the court determined the fourth factor to be present because "school districts have near-monopoly power" over sports programs that have become important to students. 110 Wn.2d at 855. Here, REI does not provide an essential service and it does not have a monopoly over bike repair and maintenance. The fourth factor is not present here.

Lastly, Jablonsky briefly argues the sixth factor is present because REI had sole control over the bike. While it is true REI had possession of the bike, Jablonsky chose REI's service and could take her bike back at any time. This is not the type of control discussed in Wagenblast where student athletes were under a coach's considerable degree of control. 110 Wn.2d at 856. Nor is this case similar to Hanks, in which the real estate agent had control over the transaction and how the seller's goals were realized. 167 Wn. App. at 550.

Considering the six <u>Wagenblast</u> factors, the release in this case does not violate public policy. Accordingly, Jablonsky waived her negligence claim and the trial court did not err by granting summary judgment for REI. We affirm.[2]

_____ Mann, J.

WE CONCUR:

_____
Díaz, J.

_____

---

[2] Because we affirm based on Jablonsky's waiver, we do not address her remaining arguments.